OPINION OF THE COURT
 

 Rosenblatt, J.
 

 On this appeal, we must decide whether Social Services Law § 122 violates the United States and New York Constitu
 
 *422
 
 tions by denying State Medicaid benefits to plaintiffs based on their status as legal aliens. We conclude that it does.
 

 L
 

 Plaintiffs are 12 aliens who lawfully reside in New York State. They immigrated to the United States from various countries, including Bangladesh, Belorussia, Ecuador, Greece, Guyana, Haiti, Italy, Malaysia, the Philippines, Syria and Turkey. As legal aliens, they fall into two groups. Some are lawfully admitted permanent residents of the United States under the Immigration and Nationality Act (i.e., green card holders)
 
 (see, 8
 
 USC § 1101
 
 et seq.);
 

 [1]
 

 the rest are permanently residing in the United States under color of law (PRUCOLs).
 
 [2]
 
 All suffer from potentially life-threatening illnesses and, but for the exclusion under Social Services Law § 122, would allegedly qualify for Medicaid benefits funded solely by the State.
 

 Plaintiffs brought a class action in Supreme Court seeking a declaration that Social Services Law § 122 violates article XVII, sections 1 and 3 of the New York State Constitution and the Equal Protection Clauses of the United States and New York State Constitutions. The putative class consists of “[a] 11 Lawful Permanent Residents who entered the United States on or after September 22, 1996 and all [PRUCOLs] who, but for the operation of New York Social Services Law § 122, would be eligible for Medicaid coverage in New York State.” The State moved to dismiss or, in the alternative, for summary judgment, for which plaintiffs cross-moved. Deferring its decision on class certification, Supreme Court denied the State’s motion and granted in part plaintiff’s motion for summary judgment, declaring that section 122 of the Social Services Law violates
 
 *423
 
 article XVII, § 1 of the New York State Constitution and the Equal Protection Clauses of the United States and New York Constitutions.
 
 (Aliessa v Whalen,
 
 181 Misc 2d 334.)
 

 Three days later, the Appellate Division decided
 
 Alvarino v Wing
 
 (261 AD2d 255). In that case, resident aliens argued that Social Services Law § 95 unconstitutionally denied them food assistance. The court held that because the State enacted the statute in direct response to a Federal supplemental appropriations bill (Pub L 105-18), the challenged classification should be evaluated, for equal protection purposes, under a rational basis standard rather than the strict scrutiny standard Supreme Court had employed.
 

 Supreme Court granted reargument in light of
 
 Alvarino
 
 and vacated the portion of its decision that declared section 122 violative of the Equal Protection Clauses of the United States and New York State Constitutions. The court left undisturbed, however, so much of its decision as held section 122 of the Social Services Law violative of article XVII, § 1 of the New York State Constitution. The Appellate Division reversed in part and affirmed in part, holding that section 122 did not violate equal protection or article XVII, § 1. Plaintiffs appeal to this Court as of right
 
 (see,
 
 CPLR 5601 [b]).
 

 IL
 

 A.
 

 The Medicaid System
 

 The Legislature established New York’s Medicaid system in 1966 (L 1966, ch 256), the year after Congress created the federally funded Medicaid program
 
 (see,
 
 Pub L 89-97, 79 US Stat 344). Under this complex scheme, the Federal government and States share the cost of providing Medicaid to certain categories of needy individuals. The shared program provides benefits to the disabled, the blind, the elderly, children, pregnant women, single-parent families and parents of children where there is a deprivation factor in the household
 
 (see,
 
 42 USC § 1396a [a]). To remain eligible for Federal matching funds, New York must conform its Medicaid program to evolving Federal standards
 
 (see,
 
 42 USC § 1396a [b]; Social Services Law § 363-a).
 

 If a State wants to extend Medicaid benefits to others, it is free to proceed at its own expense. New York has done so. It has provided non-federally subsidized Medicaid benefits to
 
 *424
 
 certain categories of individuals, including residents between the ages of 21 and 65 whose income and resources fall below a statutory “standard of need” and who are not otherwise entitled to federally subsidized Medicaid (see, Social Services Law § 366 [1]; 18 NYCRR 360-3.3 [b]). Thus, New York State’s Medicaid system has two components: one that is federally subsidized and one that the State funds entirely on its own.
 
 [3]
 

 New York had long provided State Medicaid to needy recipients without distinguishing between legal aliens and citizens. It ceased to do so, however, after Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub L 104-193, 110 US Stat 2105 [codified in scattered sections of 8 and 42 USC]) (PRWORA). Asserting that they have been unlawfully deprived of State Medicaid for which they would otherwise qualify, plaintiffs have brought this challenge.
 

 B.
 

 The Personal Responsibility and Work Opportunity Reconciliation Act of 1996
 

 After extensive debate, Congress enacted PRWORA as a comprehensive reform initiative designed to “end welfare as we know it.”
 
 [4]
 
 PRWORA touches on virtually all aspects of welfare. In this case, however, we are concerned only with title IV of PRWORA, which deals with aliens.
 
 [5]
 

 
 *425
 
 In its preamble to title IV, Congress stressed that its goals were to promote self-sufficiency — an enduring principle of United States immigration law — and to discourage aliens from immigrating here just to avail themselves of welfare or other public resources
 
 (see, 8
 
 USC § 1601 [l]-[2]). The lawmakers stated that meeting these goals was a “compelling government interest”
 
 (see, 8
 
 USC § 1601 [5]-[6]).
 

 By enacting title IV, Congress restricted alien eligibility for federally funded public assistance benefits (including Medicaid) and authorized States to follow suit with their own programs. Its restrictions govern eligibility for Federal and State retirement, welfare, health, disability, public or assisted housing, post-secondary education, food assistance and unemployment benefits, among others (see, 8 USC § 1611 [c]; § 1621 [c]). For purposes of this decision, however, we address solely its effect on Medicaid eligibility.
 

 Under title IV, aliens are divided into two categories: qualified aliens and non-qualified aliens (see, 8 USC § 1641). Broadly speaking, qualified aliens include aliens who are lawfully admitted for permanent residence (generally green card holders), granted asylum, designated refugees, paroled into the United States for at least one year, having their deportation withheld, granted conditional entry, Cuban and Haitian entrants or victims of battering or extreme cruelty by a spouse or other family member (see, 8 USC § 1641 [b]-[c]). All other aliens, including PRUCOLs, are non-qualified aliens.
 
 [6]
 
 Plaintiffs in this case fall into both categories. The lawfully admitted permanent resident plaintiffs are qualified aliens and the PRU-COL plaintiffs non-qualified aliens. These classifications carry significant Medicaid consequences.
 

 
 *426
 
 1.
 

 PRWORA’s Treatment of Aliens’ Entitlement to Medicaid
 

 Title IV renders non-qualified aliens ineligible for Federal Medicaid (8 USC § 1611 [a]). Qualified aliens are divided into two subcategories. The first subcategory includes those who were lawfully residing in the United States before August 22, 1996. Section 1612 (b) (2) requires States to provide Federal Medicaid to some, but not all, of this group.
 
 [7]
 
 The second subcategory includes those who entered the country on or after August 22, 1996. This latter group is largely ineligible for Federal Medicaid for five years (see, 8 USC § 1613 [a]).
 
 [8]
 
 Moreover, title IV authorizes States to extend the ineligibility period beyond the initial five years (see, 8 USC § 1612 [b] [1]).
 

 In addition to rendering PRUCOLs ineligible for Federal Medicaid, title IV renders them ineligible for State Medicaid as well (see, 8 USC § 1621 [a], [c] [1] [B]). Section 1621 (d), however, authorizes States to provide State Medicaid to PRUCOLs — and indeed even to illegal aliens — by enacting a new law (after August 22, 1996) “which affirmatively provides for such eligibility” (see, 8 USC § 1621 [d]).
 
 [9]
 
 As for qualified aliens, title IV does not require, but instead allows States to grant or deny them State Medicaid, subject to certain exceptions (see, 8 USC § 1622 [a]).
 
 [10]
 

 Finally, notwithstanding all of these restrictions, both non-qualified aliens and qualified aliens (during their periods of ineligibility) may receive State and federally funded emergency
 
 *427
 
 medical treatment
 
 (see, 8
 
 USC § 1611 [b] [1] [A]; § 1613 [c] [2] [A]; § 1621 [b] [1]).
 

 2.
 

 New York’s Response to PRWORA
 

 In response to PRWORA, New York enacted Social Services Law § 122, terminating Medicaid for non-qualified aliens— including PRUCOL plaintiffs
 
 (see,
 
 Social Services Law § 122 [1] [c]). New York did, however, maintain Medicaid for otherwise eligible PRUCOLs who, as of August 4, 1997, were receiving Medicaid and were diagnosed with AIDS or residing in certain licensed residential health care facilities
 
 (see,
 
 Social Services Law § 122 [1] [c]).
 

 As for qualified aliens, section 122 provides Medicaid to all otherwise eligible qualified aliens who entered the United States before August 22, 1996 and continuously resided in the United States until attaining qualified status (Social Services Law § 122 [1] [b] [i]). Those entering on or after August 22, 1996, however, are no longer immediately eligible for State Medicaid, but must now wait five years for coverage
 
 (see,
 
 Social Services Law § 122 [1] [b] [ii]).
 
 [11]
 
 This group includes the lawfully admitted permanent resident plaintiffs. Finally, all plaintiffs (both PRUCOLs and qualified aliens) may receive safety net assistance and emergency medical treatment
 
 (see,
 
 Social Services Law § 122 [c] [i]-[ii]).
 

 III.
 

 Plaintiffs argue that section 122 violates article XVII of the New York State Constitution and denies them equal protection under the United States and New York State Constitutions.
 

 A.
 

 New York State Constitution, Article XVII
 

 Plaintiffs contend that section 122 violates article XVII, § 1 of the State Constitution, which provides:
 

 “The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and
 
 *428
 
 by such means, as the legislature may from time to time determine” (NY Const, art XVII, § 1 [emphasis added]).
 

 As this provision demonstrates, care for the needy is not a matter of “legislative grace”; it is a constitutional mandate
 
 (Tucker v Toia,
 
 43 NY2d 1, 7;
 
 see also, Lovelace v Gross,
 
 80 NY2d 419, 424;
 
 Jiggetts v Grinker,
 
 75 NY2d 411, 416). Of course, New York is not required to meet every legitimate need of every needy person
 
 (see, Matter of Bernstein v Toia,
 
 43 NY2d 437, 448-449). Rather, the Legislature may determine who is “needy” and allocate the public dollar accordingly.
 

 This Court, however, has interpreted article XVII, § 1 as prohibiting the Legislature from “refusing to aid those whom it has classified as needy”
 
 (Tucker v Toia,
 
 43 NY2d, at 8,
 
 supra).
 
 In
 
 Tucker,
 
 the State required minors to obtain final orders of disposition in support proceedings against their parents before they could become eligible for home relief. We found this requirement so onerous as to constitute a practical deprivation of benefits. Needy minors, we recognized, may not know the whereabouts of their parents, or even if their parents are located in this State. In some cases, it could take a minor as long as a year to obtain a disposition in an often futile support proceeding. While waiting, needy minors were effectively denied home relief. Because the requirement imposed an overly burdensome eligibility condition on recipients — one unrelated to need — we held that the requirement contravened the “letter and spirit” of section 1 of article XVII
 
 (see,
 
 43 NY2d, at 9,
 
 supra).
 

 The State argues that the allocation scheme here does not contravene
 
 Tucker.
 
 It contends that the Constitution affords it discretion to set levels of benefits for the needy and, in the exercise of that discretion, it has provided plaintiffs full safety net assistance and emergency medical treatment. We agree that article XVII, § 1 affords the State wide discretion in defining who is needy and in setting benefit levels. Indeed, in
 
 Matter of Barie v Lavine
 
 (40 NY2d 565, 566), this Court upheld a regulation that required welfare recipients to participate in a work referral program and denied them benefits for 30 days if they failed to comply.
 

 Plaintiffs argue that section 122 does not merely set levels of benefits for the needy, but deprives them of all otherwise available ongoing medical care — a species of aid distinct from safety net assistance and emergency medical treatment. They contend that ongoing medical care covers a full spectrum of ailments,
 
 *429
 
 whereas emergency medical treatment becomes necessary when their medical conditions reach crisis or catastrophic levels. Plaintiffs and
 
 amici
 
 point out that diabetics, for example, often require daily insulin doses and blood glucose monitoring in order to stay alive, and that with such care they can lead healthy, productive lives. They are, however, denied this coverage. Treatment is unavailable until the condition reaches emergency proportions, involving insulin shock, renal failure and possibly amputation. Similarly, asthmatics receive no coverage for inhalers and medications to control their conditions. They receive no medical care until they experience severe attacks that can lead to suffocation and death. Contrasting it with emergency treatment, the Supreme Court has characterized ongoing medical care as a “basic necessity of life” (see,
 
 Memorial Hosp. v Maricopa County,
 
 415 US 250, 259-261). “To allow a serious illness to go untreated until it requires emergency hospitalization is to subject the sufferer to the danger of a substantial and irrevocable deterioration in his health”
 
 (id.
 
 at 261).
 

 In this context, plaintiffs and
 
 amici
 
 argue that when such patients are treated in emergency settings, the hospitals are not permitted to release them without a discharge plan for necessary continuing health care services, citing Public Health Law § 2803 (1) (g). Because they cannot be readily discharged, many remain in hospital facilities. Those who are discharged experience a cycle of emergency, recovery, stabilization, deterioration and the onset of another emergency. All of this, plaintiffs and
 
 amici
 
 contend, could be avoided through ongoing medical treatment.
 

 In
 
 Barie
 
 the work incentive requirement was an appropriate mechanism for identifying need. Here, however, the concept of need plays no part in the operation of section 122. Indeed, the statute suffers from an infirmity comparable to the one in
 
 Tucker
 
 and cannot be justified on the basis of a distinction between qualified aliens and PRUCOLs on the one hand, and citizens on the other. We conclude that section 122 violates the letter and spirit of article XVII, § 1 by imposing on plaintiffs an overly burdensome eligibility condition having nothing to do with need, depriving them of an entire category of otherwise available basic necessity benefits.
 
 [12]
 

 
 *430
 
 B.
 

 Equal Protection
 

 Plaintiffs argue that section 122 denies them equal protection under the United States and New York State Constitutions. The Fourteenth Amendment provides that no State shall “deny to any person within its jurisdiction the equal protection of the laws” (US Const, 14th Amend, § 1). The New York State Constitution contains its own equal protection requirement (NY Const, art I, § 11). It i¡3 axiomatic that aliens are “persons” entitled to equal protection
 
 (see, Yick Wo v Hopkins,
 
 118 US 356, 369 [“The fourteenth amendment to the constitution is not confined to the protection of citizens”];
 
 see also, Mathews v Diaz,
 
 426 US 67, 77;
 
 Takahashi v Fish & Game Commn.,
 
 334 US 410, 419-420).
 

 In considering whether a State statute violates the Equal Protection Clause, the Supreme Court applies different levels of scrutiny to different types of classifications
 
 (see, Clark v Jeter,
 
 486 US 456, 461). The parties disagree as to the level of scrutiny section 122 must withstand. Plaintiffs urge this Court to apply strict scrutiny because section 122 creates classifications based on alienage. The State argues that section 122 implements Federal immigration policy and therefore must merely withstand rational basis scrutiny. We agree with plaintiffs.
 

 As a general rule, the Supreme Court has strictly scrutinized State laws that create alienage classifications when distributing economic benefits or regulating economic activity
 
 (see, e.g., Bernal v Fainter,
 
 467 US 216, 227-228 [invalidating a Texas statute that required citizenship for notaries public];
 
 Nyquist v Mauclet,
 
 432 US 1, 7-12 [striking down a New York statute that restricted eligibility for Regents college scholarships based on alienage];
 
 In re Griffiths,
 
 413 US 717, 718-722 [invalidating a Connecticut statute that allowed only citizens to qualify for the bar examination];
 
 Graham v Richardson,
 
 403 US, at 370-376,
 
 supra
 
 [invalidating statutes in Arizona and Pennsylvania that limited welfare benefits based on citizenship];
 
 Takahashi v Fish & Game Commn.,
 
 334 US, at 414, 418-422,
 
 supra
 
 [striking down a California statute that granted commercial fishing
 
 *431
 
 licenses to citizens but denied them to aliens who were ineligible for citizenship];
 
 see generally,
 
 3 Rotunda & Nowak, Constitutional Law: Substance and Procedure § 18.12, at 469 [3d ed 1999]). Under strict scrutiny, a State statute will withstand an equal protection challenge only when the State can show that the law “furthers a compelling state interest by the least restrictive means practically available”
 
 (see, Bernal v Fainter,
 
 467 US, at 227,
 
 supra).
 

 [13]
 

 Opinion per Rosenblatt, J.
 

 Heightened scrutiny is premised on the Supreme Court’s view of the political process. The Court generally accords States broad discretion to create classifications in implementing economic and social welfare policy
 
 (see, Dandridge v Williams,
 
 397 US 471, 485). In these instances, the Court leaves it to the political process to “bring about repeal of undesirable legislation”
 
 (see, United States v Carolene Prods. Co.,
 
 304 US 144, 152-153 n 4). If a statute has “some 'reasonable basis,’ ” the Court will sustain it even if the classification “ 'is not made with mathematical nicety [or] results in some inequality’ ”
 
 (Dandridge v Williams,
 
 397 US, at 485,
 
 supra
 
 [quoting
 
 Lindsley v Natural Carbonic Gas Co.,
 
 220 US 61, 78]). Recognizing, however, that “discrete and insular minorities” can be shut out of the political process,” the Court has applied a more searching inquiry to statutes that draw classifications aimed at these groups
 
 (see, United States v Carolene Prods. Co.,
 
 304 US, at 152-153 n 4,
 
 supra).
 

 In
 
 Graham v Richardson
 
 (403 US 365, 372,
 
 supra),
 
 the Supreme Court held that as a class, aliens are a “prime example of a ‘discrete and insular’ minority * * * for whom such heightened judicial solicitude is appropriate.” Lawful resident aliens benefit our country in a great many ways. Like citizens, they contribute to our economy, serve in the Armed Forces and pay taxes
 
 (see, Hampton v Mow Sun Wong,
 
 426 US 88, 107 n 30;
 
 In re Griffiths,
 
 413 US, at 722,
 
 supra; see generally,
 
 Notes,
 
 Constitutional Limitations on the Naturalization
 
 
 *432
 

 Power,
 
 80 Yale L Journal 769, 803 [1971]) including, of course, taxes that fund State Medicaid. Nevertheless, aliens may not vote, which has historically inhibited their ability to protect their interests
 
 (see, Nyquist v Mauclet,
 
 432 US 1, 12;
 
 Hampton v Mow Sun Wong,
 
 426 US, at 107,
 
 supra; see generally,
 
 Chemerinsky, Constitutional Law: Principles and Policies § 9.5.2, at 618-619 [1997];
 
 Notes and Legislation,
 
 17 NYU LQ Rev 242, 242-243 [1940]).
 

 The State does not attempt to justify section 122 under a strict scrutiny standard.
 
 [14]
 
 Nor has it identified any “compelling governmental interest” that section 122 promotes. Instead, the State argues that strict scrutiny does not apply here. It contends that section 122 implements title IV’s Federal immigration policy and should therefore be evaluated under the less stringent “rational basis” standard. To address this argument, we must compare State and Congressional legislative authority in the context of immigration and naturalization.
 

 The Constitution empowers Congress to “establish [a] uniform Rule of Naturalization” (US Const, art I, § 8, cl [4]), “regulate Commerce with foreign Nations” (US Const, art I, § 8, cl [3]), “declare War” (US Const, art I, § 8, cl [11]) approve treaties (US Const, art II, § 2, cl [2]), and legislate over foreign affairs
 
 (see, Toll v Moreno,
 
 458 US 1, 10,
 
 supra; Mathews v Diaz,
 
 426 US, at 81 n 17,
 
 supra).
 
 In entertaining challenges to Federal immigration and naturalization statutes, the Supreme Court has interpreted these sources of authority to accord Congress — as distinguished from the States — considerable latitude
 
 (see, Fiallo v Bell,
 
 430 US 787, 792-797;
 
 Hampton v Mow Sun Wong,
 
 426 US, at 100-105,
 
 supra; Kleindienst v Mandel,
 
 408 US 753, 765-770;
 
 see generally,
 
 Chemerinsky, Constitutional Law: Principles and Policies § 3.5.1, at 204-208,
 
 supra).
 
 The Court has explained that “over no conceivable subject is
 
 *433
 
 the legislative power of Congress more complete”
 
 (Oceanic Steam Nav. Co. v Stranahan,
 
 214 US 320, 339).
 
 [15]
 

 When allocating Federal welfare benefits, the Constitution does not prohibit Congress from distinguishing between aliens and citizens. In
 
 Mathews v Diaz
 
 (426 US 67, 69, 77-81,
 
 supra)
 
 a group of aliens challenged a Federal statute that denied aliens Medicare eligibility unless they had been admitted for permanent residence and resided in the United States for at least five years. The Court held that the “decision to share [our] bounty with our guests may take into account the character of the relationship between the alien and this country: Congress may decide that as the alien’s tie grows stronger, so does the strength of his claim to an equal share of that munificence”
 
 (id.
 
 at 80). Moreover, when Federal welfare programs are jointly administered with the States, Congress may direct the States to implement national immigration objectives as long as the “Federal Government has by
 
 uniform
 
 rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass”
 
 (see, Plyler v Doe,
 
 457 US, at 219 n 19,
 
 supra
 
 [emphasis added]).
 
 [16]
 

 Relying on these cases, the State argues that section 122 does what title IV has authorized it to do with regard to Federal immigration policy. Plaintiffs contend, however, that the issue is not whether the State has followed the authorization. Rather, it is whether title IV can constitutionally authorize New York to determine for itself the extent to which it will discriminate against legal aliens for State Medicaid eligibility. Plaintiffs argue that it cannot, and we agree.
 

 Graham v Richardson
 
 (403 US 365,
 
 supra)
 
 is at the center of our analysis. There, the State of Arizona administered a Federal disability program under Federal guidelines much the same as New York administers Medicaid. Arizona argued that because its 15-year residency period for aliens was impliedly authorized by Federal law, it did not violate the Fourteenth
 
 *434
 
 Amendment
 
 (see, Graham v Richardson,
 
 403 US, at 382,
 
 supra).
 
 The Supreme Court rejected this contention, holding that a Federal statute authorizing “discriminatory treatment of aliens
 
 at the option of States”
 
 would present “serious constitutional questions” (403 US, at 382 [emphasis added]). The Court recognized that although the Federal government has broad constitutional power to distinguish among aliens in setting the rules for their admission and naturalization, “Congress does not have the power to authorize the individual States to violate the Equal Protection Clause”
 
 (see,
 
 403 US, at 382,
 
 supra).
 
 Indeed, the Court went on to state that a “congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity”
 
 (see,
 
 403 US, at 382,
 
 supra).
 

 [17]
 

 Additional Supreme Court decisions reinforce
 
 Graham’s
 
 requirement for uniformity in immigration policy
 
 (see, Plyler v Doe,
 
 457 US, at 219 n 19,
 
 supra
 
 [“(I)f the Federal Government has by
 
 uniform
 
 rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction”] [emphasis added]). Moreover, in
 
 Mathews v Diaz,
 
 the Court recognized that when it comes to State welfare policy, “there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country”
 
 (see, id.,
 
 426 US, at 85,
 
 supra).
 
 In distinguishing between Federal and State powers, the Court held that a “division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business”
 
 (see, Mathews v Diaz,
 
 426 US, at 85,
 
 supra).
 

 Finally, in
 
 Hampton v Mow Sun Wong
 
 (426 US 88, 104,
 
 supra),
 
 the Supreme Court drew limits on the power of entities
 
 *435
 
 other than Congress or the President to make alienage classifications in furtherance of Federal immigration policy. In addressing whether Federal agencies could make such classifications for civil service eligibility, the Court concluded that if Congress or the President had created the classification, it could be justifiable as a valid exercise of immigration authority in the national interest (see,
 
 id.,
 
 426 US, at 104,
 
 supra).
 
 When, however, it came to Federal agencies that did not deal directly with immigration, the Court was not willing to presume they would deliberately foster national immigration interests, which are “so far removed from [their] normal responsibilities”
 
 (see, id.,
 
 426 US, at 105,
 
 supra).
 
 Surely this is also true of the States.
 

 Title IV does not impose a
 
 uniform
 
 immigration rule for States to follow. Indeed, it expressly authorizes States to enact laws extending “any State or local public benefit” even to those aliens not lawfully present within the United States (8 USC § 1621 [d]). The converse is also true and exacerbates the lack of uniformity: Section 1622 (a) provides that, subject to certain exceptions, States are authorized to withhold State Medicaid from even those qualified aliens who are eligible for Federal Medicaid under PRWORA. Thus, in administering their own programs, the States are free to discriminate in either direction — producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics. Considering that Congress has conferred upon the States such broad discretionary power to grant or deny aliens State Medicaid, we are unable to conclude that title IV reflects a uniform national policy. If the rule were uniform, each State would carry out the same policy under the mandate of Congress — the only body with authority to set immigration policy.
 

 In exercising its discretion under title IV, New York has chosen to continue Medicaid coverage for any PRUCOL who, as of August 4, 1997, was receiving Medicaid and was either diagnosed with AIDS or residing in certain licensed residential health care facilities. This demonstrates that New York — along with every other State — with Congressional permission is choosing its own policy with respect to health benefits for resident, indigent legal aliens. Thus, we address this case outside the context of a Congressional command for nationwide uniformity in the scope of Medicaid coverage for indigent aliens as a matter of federal immigration policy.
 

 We conclude that section 122 is subject to — and cannot pass — strict scrutiny, notwithstanding title TV’s authorization.
 
 *436
 
 Because title IV authorizes each State to extend the ineligibility period for Federal Medicaid beyond the mandatory five years (see, 8 USC § 1612)
 
 [18]
 
 and terminate Federal Medicaid eligibility for certain refugees and asylees after seven years (see, 8 USC § 1612 [b] [1], [2] [A] [i]), it is directly in the teeth of
 
 Graham
 
 insofar as it allows the States to “adopt divergent laws on the subject of citizenship requirements for
 
 federally
 
 supported welfare programs” (see, 403 US, at 382,
 
 supra
 
 [emphasis added]). Moreover, title TV goes significantly beyond what the
 
 Graham
 
 Court declared constitutionally questionable. In the name of national immigration policy, it impermissibly áuthorizes each State to decide whether to disqualify many otherwise eligible aliens from State Medicaid.
 
 [19]
 
 Section 122 is a product of this authorization. In light of
 
 Graham
 
 and its progeny, title IV can give section 122 no special insulation from strict scrutiny review. Thus, section 122 must be evaluated as any other State statute that classifies based on alien-age. We hold that section 122 violates the Equal Protection Clauses of the United States and New York State Constitutions insofar as it denies State Medicaid to otherwise eligible PRUCOLs and lawfully admitted permanent residents based on their status as aliens.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this Opinion.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Graffeo concur.
 

 Order reversed, etc.
 

 [1]
 

 . Federal law requires the Immigration and Naturalization Service (INS) to issue permanent resident cards (commonly known as green cards) to lawfully admitted permanent residents (see, 8 USC § 1304 [d]).
 

 [2]
 

 . As distinguished from
 
 illegal
 
 aliens subject to deportation, this designation is used to classify aliens of whom the INS is aware, but has no plans to deport
 
 (see generally,
 
 Polen,
 
 Salvaging a Safety Net: Modifying the Bar to Supplemental Security Income for Legal Aliens,
 
 76 Wash U LQ 1455, 1455 n 3 [1998]). The classification appears in numerous statutes and regulations (see,
 
 e.g.,
 
 8 USC § 1254a [fl; 26 USC § 3304 [a] [14] [A]; 20 CFR §§ 416.1618, 416.1619; 42 CFR § 435.408). When and whether a particular alien meets a given provision’s definition has generated considerable litigation
 
 (compare Holley v Lavine,
 
 553 F2d 845, 849 [2d Cir],
 
 cert denied sub nom. Shang v Holley,
 
 435 US 947,
 
 with Sudomir v McMahon,
 
 767 F2d 1456, 1461 [9th Cir]).
 

 [3]
 

 . For purposes of this decision, we refer to federally subsidized Medicaid as “Federal Medicaid” and Medicaid entirely funded by the State and its localities as “State Medicaid.” This litigation, and our holding, relate only to the latter category
 
 (compare, Lewis v Thompson,
 
 252 F3d 567 [dealing with claims by illegal aliens for prenatal care under Federal Medicaid]).
 

 [4]
 

 .
 
 See generally, Recent Legislation: Welfare Reform
 
 — Treatment
 
 of Legal Immigrants
 
 — Congress
 
 Authorizes States to Deny Public Benefits to Noncitizens and Excludes Legal Immigrants from Federal Aid Programs,
 
 110 Harv L Rev 1191 (1997); Hoke,
 
 Symposium, State Discretion Under New Federal Welfare Legislation: Illusion, Reality and a Federalism-Based Constitutional Challenge,
 
 9 Stan L & Pol’y Rev 115 (1998);
 
 Development in Policy: Welfare Reform,
 
 16 Yale L & Pol’y Rev 221 (1997).
 

 [5]
 

 . Title IV is codified beginning at section 1601, title 8, of the United States Code. Title I of PRWORA provides block grants to States for temporary assistance to needy families. Congress designed these grants to reduce out-of-wedlock pregnancies and promote job preparation, work, marriage and two-parent families. Title II modifies eligibility requirements for Supplemental Security Income benefits for, among others, fugitive felons, probation and
 
 *425
 
 parole violators, prisoners and persons found to have fraudulently misrepresented their residences. Title III streamlines child support collection procedures, requiring uniformity throughout the States. Title V mandates a national study of children at risk of abuse or neglect. Title VI provides block grants to States to develop localized child care programs that promote parental choice and independence from public assistance. Titles VII and VIII make changes to the National School Lunch Act and the Food Stamp Act. Finally, title IX implements a variety of initiatives that, among other provisions, authorize States to test welfare recipients for controlled substances, require public housing agencies to provide certain information to law enforcement agencies and encourage the use of electronic benefit transfer systems.
 

 [6]
 

 . Illegal aliens and certain others — with whom we are not here concerned — are also non-qualified aliens (see, 8 USC § 1641).
 

 [7]
 

 . For example, section 1612 (b) (2) (A) (i) requires States to provide Federal Medicaid to certain refugees and asylees for seven years. Thereafter, States have authority to determine eligibility
 
 (see,
 
 8 USC § 1612 [b] [1]). Title IV also requires States to provide Federal Medicaid to other qualified aliens, including lawfully admitted permanent residents who worked or can be credited with 40 qualifying quarters under the Social Security Act and legally residing veterans and active duty members of the United States Armed Forces (and their dependants)
 
 (see, 8
 
 USC § 1612 [b] [2] [B]-[F]).
 

 [8]
 

 . Refugees, asylees, Cuban and Haitian entrants, veterans and their dependants, active duty soldiers in the United States Armed Forces and their dependants, and certain other qualified aliens are exempt from this restriction
 
 (see, 8
 
 USC § 1613 [b]).
 

 [9]
 

 . Section 1621 (d) refers to “State authority to provide for eligibility of illegal aliens.” Inasmuch as only PRUCOLs are before us, we need not decide the full scope of this provision. The statute obviously authorizes the State to provide State Medicaid to PRUCOLs.
 

 [10]
 

 . States must, for example, provide State Medicaid to otherwise eligible refugees, asylees, and Cuban and Haitian entrants, among others
 
 (see, 8
 
 USC § 1622 [b]).
 

 [11]
 

 . The five-year waiting period does not apply to, among others, refugees, asylees and veterans
 
 (see,
 
 Social Services Law § 122 [1] [a]).
 

 [12]
 

 . In light of this determination, we do not address plaintiffs’ argument under article XVII, § 3. In addition, we note the State’s argument that it
 
 *430
 
 enacted section 122 in response to title IV. We recognize that Federal law in the area of immigration is preemptive
 
 (see, Toll v Moreno,
 
 458 US 1, 10;
 
 DeCanas v Bica,
 
 424 US 351, 354;
 
 Graham v Richardson,
 
 403 US 365, 378;
 
 cf. Minino v Perales,
 
 79 NY2d 883, 885). In view of our holding in part III.B,
 
 infra,
 
 however, we need not reach this issue.
 

 [13]
 

 . In
 
 Plyler v Doe
 
 (457 US 202, 223,
 
 supra),
 
 however, the Supreme Court applied an intermediate level of scrutiny to a State statute that denied public education to children who were not lawfully admitted into the United States. In this context, a State must demonstrate that its classification is “reasonably adapted” to further a “substantial goal of the State”
 
 (id.
 
 at 224, 226). In addition, the Supreme Court has carved out exceptions to strict scrutiny for State laws pertaining to aliens’ eligibility for participating in the political process or holding influential public positions
 
 (see, e.g., Foley v Connelie,
 
 435 US 291, 297;
 
 Ambach v Norwich,
 
 441 US 68, 75-81;
 
 Boyd v Nebraska ex rel. Thayer,
 
 143 US 135;
 
 compare, Sugarman v Dougall,
 
 413 US 634, 643).
 

 [14]
 

 . [2] The State notes only that under title IV, a State choosing “to follow the Federal classification in determining the eligibility of [qualified] aliens for public assistance shall be
 
 considered
 
 to have chosen the
 
 least restrictive means
 
 available for achieving the
 
 compelling governmental interest
 
 of assuring that aliens be self-reliant in accordance with national immigration policy”
 
 (see, 8
 
 USC § 1601 [7] [emphasis added]). Given our system of separation of powers, a lawmaking body may not legislatively declare that a statute meets constitutional criteria
 
 (see, Board of Trustees of Univ. of Ala. v Garrett,
 
 531 US 356, 365-366;
 
 City of Boerne v Flores,
 
 521 US 507, 519).
 

 [15]
 

 . Congress has power to exclude aliens
 
 (see, Chae Chan Ping v United, States,
 
 130 US 581, 603) and may “order the deportation of aliens whose presence in the country it deems hurtful” (see,
 
 Bugajewitz v Adams,
 
 228 US 585, 592). The States have no like power (see,
 
 Plyler v Doe,
 
 457 US, at 219 n 19,
 
 supra).
 

 [16]
 

 . The Supreme Court has cautioned, however, that State “regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress” (De
 
 Canas v Bica,
 
 424 US, at 358 n 6,
 
 supra; see also, Toll v Moreno,
 
 458 US, at 12-13,
 
 supra; Plyler v Doe,
 
 457 US, at 225-226,
 
 supra).
 

 [17]
 

 . The Constitution empowers Congress to “establish [a]
 
 uniform
 
 Rule of Naturalization” (US Const, art I, § 8, cl [4] [emphasis added]). The framers of the Constitution did not include the word “uniform” by accident. It was an imperative design. James Madison decried the disorder that resulted from the operation of the Privileges and Immunities Clause of the Articles of Confederation when each State had its own criteria for citizenship (see, Federalist LXII; see
 
 also,
 
 2 Story, Commentaries on the Constitution of the United States § 1103, at 41 [1873]). Although we are not dealing with the Privileges and Immunities Clause of the United States Constitution here, the concern for uniformity is similarly present.
 

 [18]
 

 . New York has declined this invitation (see, Social Services Law § 122 [1] [b] [ii] [adopting the five-year ineligibility period]).
 

 [19]
 

 . To be sure, title IV provides States with some uniform directives (see,
 
 e.g.,
 
 8 USC § 1613 [a], [b]; § 1621 [b]; § 1622 [b]). These directives, however, do not cure the infirmity before us.