Rivera, J.
(dissenting). Defendant Jose Aviles claims the New York Police Department (NYPD) violated his federal and state equal protection and due process rights when it denied him a physical coordination test based solely on his language skills. The People defend the NYPD policy of offering the coordination test to everyone except those persons who are *507 perceived to be non-proficient in English[1] on the grounds that it ensures the reliability of the test and to do otherwise is administratively impracticable and burdensome. These representations are inadequate to overcome a policy that potentially places certain individuals in a better position than others to defend against criminal charges, especially when the NYPD has language access protocols in place and resources available to address the needs of New York City’s linguistically diverse communities. Given New York City’s commitment to access to justice regardless of language status, the NYPD’s refusal to administer a coordination test equally to all violates defendant’s federal and state equal protection rights. For these reasons, I dissent.
L
Defendant was charged with operating a motor vehicle while under the influence of alcohol or drugs in violation of Vehicle and Traffic Law § 1192 (1) and (3). Defendant was arrested after he collided with a police vehicle pulling out of a precinct as defendant drove down the street. According to the arresting officer, defendant smelled of alcohol, his speech was slurred, and he was unsteady on his feet. Upon his arrest defendant was taken to the Intoxicated Driver Testing Unit (IDTU) at the 45th Precinct in the Bronx,[2] where he took a breathalyzer test which indicated a blood alcohol content (BAC) of .06, which was below the legal minimum for a per se violation.
Ordinarily, the IDTU would have offered defendant the opportunity to take a physical coordination test, as provided in *508 the NYPD DWI Patrol Guide (Guide). The coordination test requires an arrestee to complete a series of simple tasks: reciting the person’s name and address, standing straight-up with eyes closed, walking heel-to-toe for nine steps and turning to walk back to the starting point, standing on one leg, pointing to the tip of the nose with an index finger, and writing their signature or address. Pursuant to the Guide, an officer will typically demonstrate the tasks before asking the arrestee to complete them. Here, defendant was denied the test based on the basis of what the test administrator cursorily identified as a “language barrier.”
Defendant moved to dismiss the accusatory instrument on the grounds that NYPD violated his federal and state equal protection and due process rights by failing to offer the test based on his language. The People opposed the motion, arguing both that NYPD has a legitimate interest in avoiding possible confusion by withholding the coordination test from non-English speakers and that defendant cannot have a due process interest in an investigatory procedure.
The nisi prius court stated that in the past it had addressed similar language-based claims by permitting defense counsel to cross-examine the People’s witnesses on the failure to administer the test and providing an adverse inference charge regarding the police failure to administer the test. However, in this case, the court granted the motion, concluding that where defendant’s BAC was “so very low,” denial of the coordination test “merely because he speaks only Spanish” violated his constitutional rights by failing to provide him with access to potentially exculpatory evidence. The court noted that under these circumstances “the trier of fact ... is likely to have a heightened interest in seeing a video memorializing the defendant’s abilities.”
The Appellate Term, First Department, reversed on the basis of People v Salazar (112 AD3d 5 [2013]), decided after the nisi prius court granted defendant’s motion and before the People appealed, and which rejected similar constitutional challenges to the NYPD’s policy of administering the coordination test only in English (People v Aviles, 47 Misc 3d 126[A], 2015 NY Slip Op 50347 [U] [2015]). A Judge of this Court granted defendant leave to appeal (People v Aviles, 25 NY3d 1198 [2015]).
IL
Defendant renews his constitutional challenges to NYPD’s policy, and the People reassert that the policy is nondiscrimina *509 tory and that it would be burdensome and unfeasible to administer the test other than in English. Defendant’s equal protection claim has merit because the People’s basis for denying him the test has no rational basis on the facts of this case.
Under both federal and state equal protection guarantees, government action that disadvantages a suspect class or burdens a fundamental right is subject to strict scrutiny and upheld only if there is a compelling justification for the action (Johnson v California, 543 US 499, 505 [2005]; Matter of Aliessa v Novello, 96 NY2d 418, 431 [2001]). A facially neutral policy is also subject to strict scrutiny if the government’s act has a disparate impact on a suspect class, so long as the discrimination is intentional (Washington v Davis, 426 US 229, 239 [1976]). Otherwise, government action is subject to the rational basis standard of review, which requires that the action be rationally related to a legitimate governmental purpose (Board of Trustees of Univ. of Ala. v Garrett, 531 US 356, 367 [2001]; see also Maresca v Cuomo, 64 NY2d 242 [1984]).
Here, defendant claims that he was discriminated against based on a suspect classification because the NYPD policy categorizes arrestees based on language, which defendant claims serves as a proxy for his national origin, a recognized suspect classification under both federal and state equal protection jurisprudence. In response, the People maintain that the test is neutral on its face because a person of any national origin who understands English may take the test.
In Soberal-Perez v Heckler (717 F2d 36, 41 [2d Cir 1983], cert denied 466 US 929 [1984]), decided in 1983, the Second Circuit stated that “[1] anguage, by itself, does not identify members of a suspect class.” That case involved a challenge to the Department of Health and Human Services policy of sending agency forms in English. The court applied rational basis review, holding that the Department had a legitimate interest in providing its forms only in English because the government conducts its affairs in English and “those who wish to become naturalized United States citizens must learn to read English” (id. at 42).
However, since the Soberal-Perez decision, our nation’s understanding of the role language plays in our multiethnic society has evolved. In Hernandez v New York, a case involving a prosecutor’s peremptory challenges to Latino Spanish-speaking prospective jurors, the United States Supreme Court recognized that “[i]t may well be, for certain ethnic groups and *510 in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis” (500 US 352, 371 [1991] [citations omitted]). Indeed, a policy that affects all persons who speak a given language “without regard to the particular circumstances” of the surrounding events and individuals, may be found “to be a pretext for racial discrimination” (id. at 371-372).
The judiciary is not alone in recognizing that language may serve as a proxy for national origin, ethnicity, and race. The executive branch has also acknowledged a link between language and discrimination and issued Executive Order (Clinton) No. 13166 on August 11, 2000 (“Improving Access to Services for Persons with Limited English Proficiency”) to ensure compliance with Civil Rights Act title VTs statutory prohibition against discrimination based on national origin in federally funded programs (42 USC § 2000d). To achieve its goal “to improve access to federally conducted and federally assisted programs and activities for persons who, as a result of national origin, are limited in their English proficiency” (65 Fed Reg 50,121 [Aug. 16, 2000]), the Executive Order requires federal agencies to draft guidance documents on how those programs will operate in a manner that is consistent with both title VI and the Department of Justice’s regulatory instructions.
The Department of Justice has provided guidance on Executive Order 13166, and helped municipalities to comply with title VI and its implementing regulations (e.g. Office of the Attorney General, Federal Government’s Renewed Commitment to Language Access Obligations Under Executive Order 13166 [Feb. 17, 2011]; US Department of Justice, Civil Rights Division, Language Access Assessment and Planning Tool for Federally Conducted and Federally Assisted Programs [May 2011]). The Department of Justice has made clear that criminal suspects and other persons in police custody are entitled to title VI protections during encounters with police (Department of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed Reg 41,455, 41,459 [June 18, 2002]). It has further directed that recipients of federal funds subject to title VI must take “reasonable steps to ensure meaningful access to their *511 programs and activities by [limited English proficient] persons” (id.).[3]
The limited view of the interrelationship of language, ethnicity, and national origin as articulated in Soberal-Perez does not represent today’s nuanced appreciation of how language historically affects access to justice for groups based on national origin. With an eye to this continued reality, the Court should safeguard against the use of English-only policies because “[t]he dominant cultural group can manipulate language as a device for exclusion of disfavored groups whose mother tongue is not English” (Kiyoko Kamio Knapp, Language Minorities: Forgotten Victims of Discrimination?, 11 Geo Immigr LJ 747, 752-753 [1997]).
Notably, compliance with legal mandates as a means for equal treatment of all members of our multilingual society can be realized through the government’s use of technological advances and increased human resources that address linguistic needs and simultaneously contain costs. This is especially true in New York City, where the population of limited English speakers is nearly two million people (New York City Mayor’s Office of Immigrant Affairs, Constituent Facts & Maps). In recognition of the needs of its diverse communities and of its legal obligations, New York City has issued an executive order directing its agencies to provide language services in compliance with title VI (NY City Executive Order No. 120 of 2008 [July 22, 2008] [“Citywide Policy on Language Access to Ensure the Effective Delivery of City Services”]; see also New York City Mayor’s Office of Operations, Language Access Services Initiative, https://wwwl.nyc.gov/site/operations/projects/language-access-services.page). NYPD also developed a Language Access Plan and issued internal procedures that govern law enforcement service provision to persons who are not fluent in English *512 (New York Police Department, Language Access Plan [June 14, 2012], http://www.nyc.gov/html/nypd/downloads/pdf/ public_information/lap_June_2012.pdf, cached at http:// www.nycourts.gov/reporter/webdocs/lap_June_2012.pdf; New York Police Department Patrol Guide, Procedure No. 212-90, Guidelines for Interaction with Limited English Proficient [LEP] Persons [Oct. 16, 2013]). NYPD’s official Language Access Plan encourages officers either to use a multi-language telephonic service known as “Language Line”[4] to handle most of its interpretation needs, or to contact officers that are certified through NYPD’s Language Initiative Program, which trains NYPD officers in critical languages (Language Access Plan at 4-5). Comparatively, NYPD’s Patrol Guide prompts officers to rely on other officers who self-identify as bilingual (Guidelines for Interaction with Limited English Proficient [LEP] Persons at l).[5]
This deliberate application of language services applies to the IDTU, where, for example, consent to administer the breathalyzer test is obtained by a video in Spanish (see People v Salazar, 112 AD3d 5, 7-8 [1st Dept 2013] [explaining how officers obtain consent to administer the breath test using an interpretive video]; People v Rosario, 136 Misc 2d 445, 447-448 [Crim Ct, Bronx County 1987] [same]). Similarly, NYPD has previously relied on bilingual officers to deliver the instructions on how to take the breathalyzer test (see Salazar, 112 AD3d at 8).
*513 Given New York City’s commitment to language access and the resources available to the NYPD, the policy here does not survive even rational basis review. Furthermore, the NYPD policy is not rationally related to a legitimate governmental purpose for the separate reason that by denying defendant the test, NYPD forfeits an opportunity for the People to gather evidence of intoxication. If, as the People claim, the ultimate goal is to ensure the safety of our roadways, the policy falls short.[6]
Nevertheless, the People maintain that the policy is rationally related to its interest in ensuring the reliability of the coordination test. According to the People, the test can only be administered by a specially trained officer who cannot rely on any type of interpreter service to communicate the test instructions to the arrestee. The accuracy of this assertion is neither intuitive nor obvious, and the People failed to present evidence in support of their claim that there is no other way to maintain the integrity of the test, or that they are unable to deploy test administrators fluent in the languages most often in demand.[7] More troubling is that the only source of this information about the difficulty in administering the coordination test is contained in a prosecutor’s affirmation, submitted to the nisi prius court in opposition to defendant’s motion to dismiss. The People provided no evidence to support the contention that the *514 coordination test is difficult to administer, but instead ask this Court to credit their claims. Despite the majority’s uncritical acceptance of the People’s mantra that they cannot administer this test in a language other than English, we must decline the People’s invitation to take them at their word. Indeed, where defendant’s constitutional rights are at stake, our review of the policy and the People’s reasons should be especially punctilious.
The People’s arguments are also unpersuasive because the NYPD’s own Language Access Plan for serving LEP individuals provides for a different result, and a close examination of the coordination test belies the claim. The physical coordination test involves no mechanical or technical manipulation and depends only on telling the person to make certain physical movements. The People fail to explain why the same mechanisms available to instruct in a language other than English on the rights and the use related to the breathalyzer test cannot be employed or modified for purposes of the coordination test. Indeed, the instructions for the coordination test are far more simple than those required to obtain consent to perform the breathalyzer test. The coordination test is comprised of short, declarative statements that can easily be translated, e.g. “touch your nose with your forefinger” (toque su nariz con el dedo), “walk in a straight line” (camine en linea derecha), or “raise your right leg” (levante la pierna derecha). The People’s argument contradicts common sense.[8]
The fact is that NYPD already does far more to address language barriers in the field, where access to a bilingual officer or an interpreter is less controlled. Despite the challenges, the official NYPD policy requires officers to make efforts to communicate with LEP individuals out of recognition of “the importance of effective and accurate communication between its employees and the community they serve” (Language Ac *515 cess Plan at 2).[9] Accordingly, NYPD does not have a legitimate interest in maintaining its current policy and its denial of the test to defendant violated his rights to equal protection under the law.[10]
⅜—I (—I
It is beyond cavil that the criminal justice system cannot advance procedures that benefit certain individuals but disadvantage others. Yet, the majority approves a system of justice in which English speakers are given access to potentially exculpatory evidence in DWI cases, while the same beneficial process is denied to those whose English language skills are limited due to their national origin. Such diminished treatment under the law is unconstitutional and counter to our sensibilities of fairness. It is especially unacceptable where the means to ensure equality are within reach.
For the reasons I have explained, I would reverse the Appellate Term and dismiss the accusatory instrument. Therefore, I dissent.
Chief Judge DiFiore and Judges Pigott, Abdus-Salaam and Stein concur; Judge Rivera dissents in an opinion in which Judge Fahey concurs.
Order affirmed.

. For purposes of clarity and uniformity, I have adopted the parties’ description of persons denied the coordination test as “non-English proficient” or “limited English proficient” (LEP). The Equal Access to Human Services provision of New York City’s Human Rights Law defines a LEP person as “an individual who identifies as being, or is evidently, unable to communicate meaningfully with agency or agency contractor personnel because English is not [the individual’s] primary language” (Administrative Code of City of NY § 8-1002 [o]). Though the majority characterizes defendant as not being a LEP individual because of the nisi prius court’s determination that he speaks “only Spanish, and not English” (majority op at 501 n 1), defendant clearly falls within New York City’s understanding of a LEP individual.

. The only issue before the Court is the constitutionality of the unofficial NYPD policy to withhold the coordination test from LEP individuals at New York City IDTUs. These IDTUs are unique to New York City, as the officers in all other municipalities in the state conduct sobriety tests roadside. Accordingly, the use of the IDTUs creates different expectations of NYPD, as NYPD officers have additional resources available to them for the processing of drunk drivers. Accordingly, I limit my analysis to the NYPD policy at ID-TUs.

. In the title VII context, the Equal Employment Opportunity Commission (EEOC) has acknowledged the interconnectedness of language and national origin, and that neutral language policies can mask discriminatory animus and disparate treatment. As such, the EEOC guidelines broadly define national origin discrimination to include “linguistic characteristics of a national origin group” for the purposes of title VII enforcement (29 CFR 1606.1). The EEOC further advises employers that “[t]he primary language of an individual is often an essential national origin characteristic” (id. § 1606.7 [a]). Relatedly, the Southern District of New York has recently applied the EEOC’s interpretation to hold that an English-only policy in the workplace violated title VU’s prohibition on national origin discrimination (Equal Empl. Opportunity Commn. v Sephora USA, LLC, 419 F Supp 2d 408 [SD NY 2005]).

. Language Line is a private company that provides on-demand interpretation through the telephone, 24 hours a day. People in need of interpretation call in to connect with an interpreter, who can immediately facilitate a conversation between two or more people who do not speak the same language (Language Line Solutions, Phone Interpreting, https:// www.languageline.com/interpreting/phone [last accessed Nov. 10, 2016]).

. The record on appeal is thin, and the People failed to submit any information about NYPD’s language resources. Yet, defense counsel submitted NYPD’s Language Access Plan, NYPD’s field guide for serving LEP individuals, and other supporting documents, all of which the Court is permitted to take judicial notice (see Affronti v Crosson, 95 NY2d 713, 720 [2001]). Thus, the majority’s contention that there is no record support for the claim that NYPD is equipped to interact with LEP individuals is false, as these publicly-available documents indicate that NYPD both intends to and is capable of doing so.
Contrary to the majority’s assertion, defendant preserved his claim that NYPD’s policy of denying the test based on language is unconstitutional because NYPD is capable of providing interpretative services. Therefore, it is wholly proper and prudent to consider all public documents regarding both NYPD’s and the City’s linguistic resources (see Affronti, 95 NY2d at 720).

. The majority contends that NYPD’s goal in withholding the test is “avoiding delayed or erroneous results due to a language barrier” (majority op at 504). Contrary to this assertion, the NYPD policy does not rationally further any legitimate goal, as NYPD has the available means for immediate and accurate interpretive services that would eliminate both the delay in testing and the potential for error. The majority’s claim that the NYPD goal is to avoid detrimental results is unsupported by the record because there is no factual or scientific basis propounded by the People for such a claim.

. I need not define the most in demand languages, despite the majority’s suggestion otherwise (majority op at 505), because there is governmental consensus in New York City about its population’s linguistic needs. NYPD’s Language Access Plan identifies its “baseline languages” as Spanish, Chinese, Korean, Haitian Creole, Russian and Italian (New York Police Department, Language Access Plan at 10 [June 14, 2012]). The New York City Human Rights Law mandates that all city services and documents be provided in the same “covered languages” (Administrative Code §§ 8-1002 g]; 8-1003, 8-1004). Executive Order 120 also requires that all of New York City’s services be provided in these six languages (NY City Executive Order No. 120 of 2008 [July 22, 2008] [“Citywide Policy on Language Access to Ensure the Effective Delivery of City Services”]). Thus, the city government has identified those languages most spoken.

. The majority’s characterization of this test as difficult to administer is based on an affirmation of an Assistant District Attorney. However, the People failed to submit either evidence from an experienced administrator who has firsthand knowledge about the test’s complexity or expert linguistic testimony concerning the need for instruction to be provided solely by the test administrator in English. Absent such evidence, the People’s “proof” is but a shell. Yet, the majority adopts the People’s argument while disregarding that NYPD has a variety of tools it can use to administer this test in a manner that does not violate defendant’s constitutional rights.

. The NYPD has long been on notice that failing to address language needs is a violation of title VI disparate impact regulations, based on national origin. In 2010, the Department of Justice issued a report in which it informed NYPD that it was not in full compliance with title VI. The report indicated that officers frequently departed from NYPD’s internal policy when interacting with LEP individuals because NYPD did not provide sufficient translation services. NYPD responded by updating its Language Access Plan.

. Since defendant has established a meritorious equal protection challenge, I have no occasion to address his due process claim.