HENRY, J.,
dissenting.

I. Introduction

Although America is very much a nation of immigrants, portions of its history are replete with instances of discriminatory policies and practices against aliens. “Whether it is founded on economic protectionism, xenophobia, or other motivations, aliens frequently have been denied benefits and privileges accorded to citizens.” ERWin Chemerinsicy, Constitutional Law: PRINCIPLES AND POLICIES § 9.5.1 at 738 (2d ed.2002). Even the judiciary, charged under the Constitution with the protection of rights, does not have a pure historical record. See, e.g., Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); see also William H. Rehnquist, The Supreme Court: How it Was, How it Is 313 (1987) (“But a governmental order classifying people solely on the basis of race without any inquiry into disloyalty in a particular case undoubtedly strains the bounds of the Constitution even in time of war.”). Fortunately, the Supreme Court clearly reversed that trend in Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), holding that strict scrutiny is appropriate to safeguard the constitutional rights of aliens.[1]
In the case at bar, the majority has advanced a deft methodology, but it disregards the Supreme Court’s mandate that we apply strict scrutiny to a state’s classification of persons on the basis of United States citizenship for the purposes of distribution of economic benefits. Colorado’s program undisputedly discriminates between subclasses of legal aliens and classifies a group of legal aliens as ineligible for benefits. The majority holds that, under Graham and its progeny, if the federal government expresses a policy that gives the states the option to provide coverage for legal aliens, then we apply rational review to the state’s actions. In refusing to apply strict scrutiny to Colorado’s classification of legal immigrants as ineligible for Medicaid coverage, the majority compromises this court’s equal protection jurisprudence, as Colorado S.B. 03-176 compromises the rights of legal, tax-paying, and military-serving aliens.

II. The General Rule

In Graham, the Supreme Court reiterated that the Fourteenth Amendment man *1266 dates that “classifications based on alien-age, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.” 403 U.S. at 372, 91 S.Ct. 1848 (footnotes omitted). The protections of the Fourteenth Amendment have long-applied to non-citizens; indeed, its “provisions are universal in their appli-eation[ ] to all persons within the territorial jurisdiction[ ] without regard to any difference or race, or color, or of nationality.” Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).
We have long recognized that “[ajliens as a class are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate.” Graham, 403 U.S. at 372, 91 S.Ct. 1848 (internal quotation marks and citation omitted); see United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). As the late Professor John Hart Ely, one of America’s most distinguished constitutional scholars observed, the “Equal Protection Clause is properly read to extend unusually strenuous protection to aliens.” John Hart Ely, Democracy and Distrust 194 n. 51 (1980). In fact, Professor Ely also argued that the Privileges and Immunities Clause could, and perhaps should, be read to apply to aliens. See id. at 24-25.
The unbiased treatment of legal aliens — the “strangers at thy gates” — is more than simply a long-standing tradition from which U.S. citizens have benefitted: it is a bedrock principle of the development of law-based nations and cultures throughout history. Recent policy initiatives underscore our nation’s abidance to the tenet of nondiscrimination based on national origin. See, e.g., Exec. Order No. 13,166 (delineating parameters for the provision of meaningful access to federal programs for persons of limited English proficiency to assure compliance with Title VI of the Civil Rights Act of 1964, as amended, and its implementing regulations).
The recognition of aliens as a discrete and insular minority partially stems from the preclusion of aliens from voting. Aliens are thus unable to protect themselves through the normal democratic process. See Toll v. Moreno, 458 U.S. 1, 21, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (Blackmun, J., concurring) (“[T]he Court always has recognized that aliens may be denied use of the mechanisms of self-government, and all of the alienage cases have been decided against the backdrop of that principle.”).
Justice Blackmun, concurring in Toll v. Moreno, gave a compelling explanation of the Court’s consistent treatment of the discrete class of aliens:
If anything, the fact that aliens constitutionally .may be — and generally are— formally and completely barred from participating in the process of self-government makes particularly profound the need for searching judicial review of classifications grounded on alienage. I might add that the Court explicitly has endorsed this seemingly self-evident proposition: in Hampton v. Mow Sun Wong, 426 U.S. 88 [96 S.Ct. 1895, 48 L.Ed.2d 495] (1976), after noting that “[s]ome of [an alien’s] disadvantages stem directly from the Constitution itself,” the Court declared that “[t]he legitimacy of the delineation of the affected class [of aliens] buttresses the conclusion that it is a discrete and insular minority ... and, of course, is consistent with the premise that the class is one whose members suffer special disabilities.” Id. at 102, n. 22 [96 S.Ct. 1895, 48 L.Ed.2d 495].
Toll, 458 U.S. at 23-24, 102 S.Ct. 2977 (Blackmun, J., concurring) (emphasis supplied).
*1267 Similarly, then-Associate Justice Rehnquist explained:
It is clear, therefore, that the reason alienage classifications receive heightened judicial scrutiny is because aliens, qua aliens, are a “discrete and insular” minority. Presumptively, such a minority group, ... is one identifiable by a status over which the members are powerless. And it is no doubt true that all aliens are, at some time, members of a discrete and insular minority in that they are identified by a status which they are powerless to change until eligible to become citizens of this country.
Nyquist v. Mauclet, 432 U.S. 1, 17-19, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (Rehnquist, J., dissenting) (internal quotation marks and citations omitted).
Because of the relatively powerless status aliens maintain in our society, laws that create classifications based on alien-age are presumptively invalid, and the classification will be found to be constitutional only if the state can demonstrate that the law is the least restrictive means to achieve a compelling state interest. In re Griffiths, 413 U.S. 717, 721-22, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (“In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary ... to the accomplishment of its purpose or the safeguarding of its interest.”) (internal footnotes and quotation marks omitted).[2] As Justice Black-mun made clear, by labeling aliens as a discrete and insular minority, the Court reiterated its “considered conclusion that for most legislative purposes there simply are no meaningful differences between resident aliens and citizens, so that aliens and citizens are persons similarly circumstanced who must be treated alike.” Toll, 458 U.S. at 20, 102 S.Ct. 2977 (Blackmun, J., concurring) (internal quotation marks omitted). With this considered conclusion in mind, we turn to its application to Colorado’s statute.
A. The Twin Holdings of Graham v. Richardson
It is well-recognized that Graham established two distinct constitutional hurdles for state legislation discriminating against *1268 legal immigrants: (a) Part II of the opinion, which mandates that state legislation must satisfy strict scrutiny, 403 U.S. at 372, 91 S.Ct. 1848 (“Aliens as a class are a prime example of a ‘discrete and insular’ minority for whom such heightened judicial solicitude is appropriate.”) (internal citations omitted); and (b) Part III of the opinion, which holds that state legislation must not encroach upon exclusive federal power, id. at 380, 91 S.Ct. 1848 (“Since such laws encroach upon exclusive federal power, they are constitutionally impermissible.”). See also Toll, 458 U.S. at 30, 102 S.Ct. 2977 (O’Connor, J., concurring) (recognizing the encroachment of federal power as an “alternative ground” for striking the state statute). The twin holdings of the Court are also apparent from the Court’s vote: the Court unanimously held that state legislation cannot encroach upon exclusive federal power. Justice Harlan did not join the Court’s equal protection ruling (Part II of the opinion).
1. Strict scrutiny
In Graham, the Court considered a Pennsylvania law that made noncitizens ineligible to receive public assistance and an Arizona statute that imposed a dura-tional residency requirement for welfare benefits on aliens but not on citizens. Like Colorado’s S.B. 03-176, the Arizona statute served to discriminate only within the class of aliens: “Aliens who met the durational residency requirement were entitled to welfare benefits.” Nyquist, 432 U.S. at 8-9, 97 S.Ct. 2120 (discussing Graham). The Court nonetheless subjected the statutes to strict scrutiny and both statutes were held unconstitutional. Graham, 403 U.S. at 372, 91 S.Ct. 1848.
2. Encroachment of federal power
“As an alternative ground, the [Graham] Court also declared the law invalid as an encroachment on federal power.” Toll, 458 U.S. at 30, 102 S.Ct. 2977 (O’Con-nor, J., concurring). The plaintiffs do not challenge that the federal preemption holding of Part III of the Graham opinion is not at issue here. Colorado is not imposing “auxiliary burdens upon the entrance or residence of aliens,” because it is acting pursuant to federal authorization in 8 U.S.C. § 1612(b). Graham, 403 U.S. at 379, 91 S.Ct. 1848; accord DeCanas v. Bica, 424 U.S. 351, 358 n. 6, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (discussing preemption and noting that “state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress”). As such, we should focus on the strict scrutiny holding in Part II of Graham.
B. Strict Scrutiny Post-Graham
As the majority notes, since Graham, “the Court has experienced no noticeable discomfort in applying strict scrutiny to alienage classifications.” Toll, 458 U.S. at 22, 102 S.Ct. 2977 (Blackmun, J., concurring); see Maj. op. at 1250; see, e.g., Examining Bd. v. Flores de Otero, 426 U.S. 572, 601-02, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (applying strict scrutiny for limitations on state civil engineering licenses and noting that the Court had “establish[ed] that state classifications based on alienage are subject to strict judicial scrutiny”) (internal quotation marks omitted); Sugarman v. Dougall, 413 U.S. 634, 642, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (holding that the exclusion of aliens from civil service jobs denied them equal protection and that a “flat ban on the employment of aliens in positions that have little, if any relation to a State’s legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment”); In re Griffiths, 413 U.S. at 721, 93 S.Ct. 2851 (applying strict scrutiny to a state law that excluded aliens from being licensed as attorneys); see also Co *1269 bell v. Chavez-Salido, 454 U.S. 432, 438, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (“[Citizenship is not a relevant ground for the distribution of economic benefits.”).
In Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Supreme Court upheld as constitutional the amendments to the Social Security Act that conditioned an alien’s eligibility for Medicare benefits on the alien’s continuous residence in the United States for five years and admission for permanent residence. In doing so, the Supreme Court recognized that
the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.
426 U.S. at 81, 96 S.Ct. 1883. Mathews also distinguished Graham, recognizing that its “equal protection analysis ... involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government.” Id. at 84-85, 96 S.Ct. 1883. The Court explained that
[ijnsofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State’s interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.
Id. at 85, 96 S.Ct. 1883 (emphasis supplied). The Court thus articulated the “distinction between alienage classifications imposed by the federal government and those created by state and local governments.” Chemerinsky, supra, § 9.5.4. The federal government, rather than the states or the judiciary, regulates the condition of entry and residence of aliens. Mathews, 426 U.S. at 85, 96 S.Ct. 1883. Thus, whereas the federal government might “routinely] and normally” create divisions between citizens and aliens as a “legitimate part of its business,” a similar division a by a state “has no apparent justification.” Id. Because “the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government,” id. at 81, 96 S.Ct. 1883, the Supreme Court afforded the statute a deferential standard of review. Id. at 82, 96 S.Ct. 1883. The Court thus upheld the federal program because it was not “wholly irrational” and served the “legitimate” purpose of securing the fiscal integrity of the Medicaid program at issue. Id. at 83, 85, 96 S.Ct. 1883.
Particularly relevant here, as the majority notes, is that in the following year, the Court applied Graham’s strict scrutiny analysis to invalidate a New York law that limited financial aid for higher education to citizens, those who had applied for citizenship, and those who declared an intent to apply when they became eligible. Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). In explaining the rationale of Mathews, the Court also noted that, “classifications by a State that are based on alienage are inherently suspect and subject to close judicial scrutiny.” Id. *1270 at 7, 97 S.Ct. 2120 (emphasis supplied) (internal quotation marks omitted). .“Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States.” Id. at 7 n. 8, 97 S.Ct. 2120. The Court also emphasized the inherent discriminatory intent of the statute, noting that the law “is directed at aliens and ... only aliens are harmed by it.” Id. at 9, 97 S.Ct. 2120.

III. Application of Graham by the Majority

Given this background of the Court’s consistent application of strict scrutiny to a state statute that discriminates between citizens and resident aliens, we turn to the majority’s analysis. The majority first recognizes that a “central holding” of Graham is that “state laws creating citizen-alien classifications must meet strict scrutiny.” Maj. op. at 1250. But the majority soon reverses and declares that Graham does not apply because “we have specific Congressional authorization for the state’s action, the PRWORA.” Id. at 1251-52. As a result, the majority appears to have conflated the twin holdings of Graham, which has resulted in a misapplication of Graham’s central tenet.
A. The Majority’s Misapplication of Graham
As indicated above, Graham held first, that we must subject a state’s classifications based on alienage to “close judicial scrutiny.” 403 U.S. at 372, 91 S.Ct. 1848. The Court went on to hold that “[a]n additional reason” a state statute might not “withstand constitutional scrutiny emerges from the area of federal-state relations,” citing conflict with “overriding national policies” where the federal government has occupied the field with its “superior authority.” Id. at 376-78, 91 S.Ct. 1848 (emphasis supplied). As mentioned above, the plaintiffs do not argue that the statute violates the preemption prong of Graham. Plaintiffs’ arguments stem from the discrete strict scrutiny holding of Graham.
The majority correctly concludes that Mathews does not apply, because “[ujnlike Mathews, here we have a state-administered program.” Maj. op. at 1251-52 (emphasis supplied). While holding that a rational basis test applies to federal policy regarding an alien’s eligibility for welfare programs, the Court recognized that a similar “division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification.” Mathews, 426 U.S. at 85, 96 S.Ct. 1883. As the majority indicates, the circuit cases applying rational basis to a federal statutory classification of aliens, as administered by a state, routinely recognize that “the strict scrutiny standard does apply to Fourteenth Amendment equal protection challenges to a state’s classification of aliens.” Rodriguez v. United States, 169 F.3d 1342, 1347 (11th Cir.1999) (citing Graham); Aleman v. Glickman, 217 F.3d 1191, 1199 n. 5 (9th Cir.2000) (recognizing that Mathews noted “equal protection analysis ... involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government”) (quoting Mathews, 426 U.S. at 84-85, 96 S.Ct. 1883) (alterations in original); City of Chicago v. Shalala, 189 F.3d 598, 605 (7th Cir.1999) (“ ‘The States enjoy no power with respect to the classification of aliens.’ ”) (quoting Plyler, 457 U.S. at 225, 102 S.Ct. 2382); see also Lewis v. Thompson, 252 F.3d 567, 583 (2d Cir.2001) (plaintiffs do not contest that rational basis scrutiny applies to federal classification of eligibility for welfare benefits to the extent that they are asserting harm to themselves).
*1271 B. The Majority’s Reading of the State Courts’ Application of Graham
Turning to the state courts that have applied restrictions and classifications based on alienage, the majority presents Aliessa v. Novello, 96 N.Y.2d 418, 730 N.Y.S.2d 1, 754 N.E.2d 1085 (2001), and Doe v. Comm’r of Transitional Assistance, 437 Mass. 521, 773 N.E.2d 404 (2002), as adopting contending approaches: Aliessa applied strict scrutiny to a state’s termination of state Medicaid coverage for many qualified aliens, while Doe applied a rational basis analysis to “state-made in-tra-alien classifications.” Maj. op. at 1253. In fact, a closer reading of the cases reveals that the New York State Court of Appeals and the Massachusetts Supreme Court decisions are not incongruous, but are in fact, complementary and represent a consistent application of the Supreme Court’s jurisprudence in the wake of Graham.
1. Aliessa
The New York State legislature enacted Social Service Law § 122, which terminated Medicaid for various non-qualified aliens and placed a five-year residency requirement for eligibility for state Medicaid benefits. This latter group included lawfully admitted permanent residents.
As the majority opinion points out, “[t]he parties’ equal protection arguments in Aliessa mirrored those of the parties in this case: the plaintiffs argued that the state law discriminated based on alienage and that strict scrutiny should apply, and the state argued that it was acting with Congress’s permission and that rational-basis review was appropriate.” Maj. op. at 1252-53. The New York Court of Appeals presented a convincing rejection of the New York statute at issue:
We conclude that section 122 is subject to — and cannot pass — strict scrutiny, notwithstanding title IV’s authorization. Because title IV authorizes each State to extend the ineligibility period for Federal Medicaid beyond the mandatory five years and terminate Federal Medicaid eligibility for certain refugees and asy-lees after seven years ..., it is directly in the teeth of Graham insofar as it allows the States to “adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs.” ... Moreover, title IV goes significantly beyond what the Graham Court declared constitutionally questionable. In the name of national immigration policy, it impermissibly authorizes each State to decide whether to disqualify many otherwise eligible aliens from State Medicaid. Section 122 is a product of this authorization. In light of Graham and its progeny, title IV can give section 122 no special insulation from strict scrutiny review. Thus, section 122 must be evaluated as any other State statute that classifies based on alienage. We hold that section 122 violates the Equal Protection Clauses of the United States and New York State Constitutions insofar as it denies State Medicaid to otherwise eligible PRUCOLs and lawfully admitted permanent residents based on their status as aliens.
Aliessa, 730 N.Y.S.2d 1, 754 N.E.2d at 1098-99 (internal citation omitted) (emphasis supplied); see Maj. op. at 1252-54.
2. Doe
In Doe, the Massachusetts Supreme Court applied rational basis analysis to a supplemental benefits program that imposed a residency requirement on qualified aliens applying for benefits. A key difference in the Massachusetts Supreme Court’s analysis, noted in the majority opinion only by a parenthetical, is that the program affected in Massachusetts was a *1272 supplemental benefits program that was open to only aliens and designed to benefit only aliens; that is, the program was enacted by the state legislature to supplement federal benefits that had been taken away from Massachusetts aliens by Congress. See Doe, 773 N.E.2d at 411 (“It is undisputed that the Massachusetts Legislature was not required to establish the supplemental benefits program. It is also undisputed that the supplemental program provides no benefits to citizens, and that the only persons eligible for benefits are qualified aliens.”).
The court held it axiomatic that the supplemental program crafted to restore benefits to aliens could not discriminate against aliens and in favor of citizens. Id. (“[W]e are left to determine what standard of review to apply to a State law that does not discriminate between citizens and aliens.”). Thus, noting the “critical differences” between the New York and Massachusetts statutes, 773 N.E.2d at 412, and heeding the admonitions of Nyquist that strict scrutiny applies to a statute that “discriminate[s] only within the class of aliens,” 432 U.S. at 8, 97 S.Ct. 2120, the Massachusetts Supreme Court determined that Aliessa’s strict scrutiny review could not apply. See Doe, 773 N.E.2d at 412 (distinguishing Nyquist: Unlike the New York statute at issue there, “the Massachusetts statute establishes a program open only to aliens, imposes a residency requirement on all who are qualified to apply for its benefits, and does not harm aliens by barring them from the benefits of the program.”); id. at 413 (distinguishing Aliessa: “Unlike the supplemental program created [by the Massachusetts Legislature], the amended New York State Medicaid program presented ... the very paradigm so definitively addressed in Graham.”). It is this distinction between the Colorado and Massachusetts statutes that mandates we view S.B. 03-176 through the lens of strict scrutiny. Thus, the Massachusetts court did not reach a decision inconsistent with Aliessa; in fact, the court cited Aliessa with approval and carefully distinguished its holding. Id. at 413.

TV. Other Arguments Presented by the Defendant

The defendant vehemently resists the application of strict scrutiny to S.B. 03-176 and professes three additional or alternative reasons to apply rational basis examination: (1) Colorado’s need to protect its fiscal integrity; (2) S.B. 03-176 reallocates federal, not state benefits; and (3) PRWORA actually authorized the enactment of S.B. 03-176. None of these arguments is persuasive.
A. Fiscal Integrity
First, the defendant cites Colorado’s vital economic interest in promulgating S.B. 03-176, arguing that the measure is necessary to balance the $850 million budget deficit. The State estimates that it will save $5.9 million (or 0.67% of the total $869 million in the State’s budget deficit) annually by eliminating medical coverage to legal aliens.
In applying a rational basis test to the pro-alien statute at issue in Doe, the Massachusetts Supreme Court clearly considered the purpose and the “clearly noninvidious intent behind [the program’s] promulgation” when it applied the rational basis test. See Maj. op. at 1254 (quoting Doe, 773 N.E.2d at 414) (emphasis supplied). Here, we only have the self-professed state interest of fiscal integrity, which has been squarely rejected by the United States Supreme Court:
[A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not ac *1273 complish such a purpose by invidious distinctions between classes of its citizens. The saving of welfare costs cannot justify an otherwise invidious classification.
Graham, 403 U.S. at 374-75, 91 S.Ct. 1848 (internal quotation marks omitted) (emphasis supplied). The impact upon the State is “not very significant in comparison to the irreparable harm that would be caused” to those denied coverage. Kansas Hosp. Ass’n v. Whiteman, 835 F.Supp. 1548, 1553 (D.Kan.1993). Furthermore, “[t]he state is in a much better position to absorb the budgetary impact of delayed implementation of the amendment as compared to individual plaintiffs.” Id.[3] Colorado’s suggestion that the preservation of its fiscal integrity, through a projected savings of $5.9 million, warrants the upholding of S.B. 03-176 is not sustainable.
B. S.B. 03-176 Reallocates Federal, not State Benefits
Second, the defendant’s argument that S.B. 03-176 is essentially a reallocation of federal, not state, benefits does not insulate its discriminatory program from strict scrutiny review. The defendant emphasizes Congress’s reading of Graham’s holding as one curtailing the states from “denyfing] legal permanent residents State-funded assistance.” Aple’s Br. at 14 (quoting H.R. Conf. Rep. No. 104-725 (1996), U.S.Code Cong. & AdmimNews 1996 p. 2105) (emphasis supplied). In addition, the district court denied a preliminary injunction largely because “[t]he program at issue here is not a state-only funded program as in Graham and Alies-sa.” 257 F.Supp.2d at 1326. S.B. 03-176 impacts a “jointly funded component of Medicaid.” Id.
However, Graham’s strict scrutiny analysis was in no way limited to state-funded programs. See Graham, 403 U.S. at 367, 91 S.Ct. 1848 (noting that the Arizona state program was “supported in part by federal grants-in-aid and administered by the States under federal guidelines”); id. at 368, 91 S.Ct. 1848 (noting that Pennsylvania’s general assistance program was “not federally supported”); id. at 376, 91 S.Ct. 1848 (striking down both statutes for failure to satisfy strict scrutiny); see also Nyquist, 432 U.S. at 3 n. 2, 97 S.Ct. 2120 (applying strict scrutiny to loan program in question which was “largely subsidized by the Federal Government”). Thus, the defendant’s reliance on the statute’s misreading of Supreme Court case law is unpersuasive.
*1274 In a similar vein, the defendant maintains that Congress has devolved its plenary powers to determine alien eligibility for welfare benefits, by “allowing states to choose to extend benefits to other subgroups [of aliens] when administering federal programs.” Aple’s Br. at 14. As noted above, plaintiffs concede that PRWORA grants the states the power to act under § 1612(b). As such, this analysis only applies to Part III of Graham, not to Graham’s strict scrutiny analysis in Part II of the opinion.
“The authority to control immigration— to admit or exclude aliens' — is vested solely in the Federal government.” Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915); see also The Federalist No. 32, at 201 (Alexander Hamilton) (Jacob E. Cook, ed., 1961) (noting that the federal government had exclusive jurisdiction where the Constitution granted Congress the power to make uniform laws, and “[t]his must necessarily be exclusive; because if each State had power to prescribe a DISTINCT rule, there could be no uniform rule”). To permit a comprehensive Congressional devolution of its exclusive powers would be tantamount to saying “that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the states as chose to offer hospitality.” Truax, 239 U.S. at 42, 36 S.Ct. 7. To allow such divergence and discrimination in the welfare rights arena would be to ignore the “crucial role ... such benefits play in providing the poor with ‘means to obtain essential food, clothing, housing, and medical care.’ ” Nyquist, 432 U.S. at 13, 97 S.Ct. 2120 (Burger, C.J., dissenting) (quoting Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); id. (“Welfare benefits [are] essential to sustain life for aliens [eligible for such benefits.]”)). See also Plyler, 457 U.S. at 219 n. 19, 102 S.Ct. 2382 (“[I]f the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.”) (citing DeCanas, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43) (preemption case focusing on supremacy clause and the INA)).
As the New York Court of Appeals noted, “[i]f the rule were uniform, each State would carry out the same policy under the mandate of Congress.” Aliessa, 730 N.Y.S.2d 1, 754 N.E.2d at 1098 (emphasis supplied); see Wendy Zimmermann and Karen C. Tumlin, Patchwork Policies: State Assistance for Immigrants Under Welfare Reform (The Urban Institute 1999), available at http://www.ur-ban.org/url.cfm?ID=309007. To apply PRWORA as the defendants interpret it, Congress is advocating “potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics,” which only “exacerbates the lack of uniformity.” Aliessa, 730 N.Y.S.2d 1, 754 N.E.2d at 1098. Moreover, the United States concedes that PRWORA promotes such variations noting that it “represents a compromise on a difficult public policy question because it enables some States to be relatively generous without imposing an unacceptably heavy burden on other States.” U.S. Br. at 17 (emphasis supplied). To allow a patchwork of state policies to prop up this admitted compromise does not support Colorado’s construction of PRWORA. Indeed, the government’s candid and proper admission that Congress could not decide on a federal policy but achieved a “compromise” clearly reveals no uniform policy was adopted.
C. PRWORA Authorized the Enactment of S.B. 03-176
Third, the defendant argues that Title IV of PRWORA authorized Colorado’s en *1275 actment of S.B. 03-176. To apply separate standards of review to states that act pursuant to PRWORA would lead to “an absurd construction of PRWORA.” Aple’s Br. at 11. The benefits Congress delineated as “optional” become “mandatory.” Id.
The Supreme Court rejected a similar argument put forth by Arizona in Graham. In Part IV of its opinion, the Court considered, and rejected, Arizona’s argument that the durational requirement was actually authorized by federal law. The Court stated that “[o]n its face, the statute does not affirmatively authorize, much less command, the States to adopt durational residency requirements or other eligibility restrictions applicable to aliens.” 403 U.S. at 381, 91 S.Ct. 1848.
Under this theory, there would be few if any limits to a state’s ability to discriminate against legal immigrants once given the “option.” In Graham, the Court considered the legislative history of the Congressional acts at issue, and rejected this theory. The Court noted that to the extent Congress sought to “authorize discriminatory treatment of aliens at the option of the States ... serious constitutional questions are presented.” Graham, 403 U.S. at 382, 91 S.Ct. 1848 (emphasis supplied).
In addition, Congress itself anticipated that state laws that alter legal aliens’ eligibility for jointly funded benefit programs enacted pursuant to § 1607 would be subject to strict scrutiny. Section 8 U.S.C. § 1601(7) states:
With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.
Id. Congress clearly anticipated that state statutes would be challenged, and hoped that in explaining Graham and enunciating that such state policies would satisfy Graham’s strict scrutiny, the state programs might survive strict scrutiny.[4] See H.R.Rep. No. 104-651, at 1445-46. But in our constitutional structure it is for the courts to “say what the law is,” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and, “[ajlthough the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.” Graham, 403 U.S. at 382, 91 S.Ct. 1848 (emphasis supplied). As a result, S.B. 03-176 would be still subject to strict scrutiny.

V. Conclusion

“Resident aliens are obligated to pay their full share of the taxes that support the assistance programs [at issue.]” Ny-quist, 432 U.S. at 12, 97 S.Ct. 2120. The Court’s “previous decisions have emphasized that immigrant aliens have been *1276 lawfully admitted to this country for permanent residence and share many of the normal burdens of citizenship, such as the duty to pay taxes and to serve in the Armed Forces.” Toll, 458 U.S. at 44, 102 S.Ct. 2977 (Rehnquist, J., dissenting) (citing Nyquist, 432 U.S. at 12, 97 S.Ct. 2120; Hampton, 426 U.S. at 107 n. 30, 96 S.Ct. 1895; Sugarman, 413 U.S. at 645, 93 S.Ct. 2842; Graham, 403 U.S. at 376, 91 S.Ct. 1848).
“[T]he denial of benefits cannot be justified on the grounds that immigrants are an especially poorly motivated group that is unlikely to achieve economic self-sufficiency.” Kaestner, supra, at 4. We cannot forget that the laws that work to the disadvantage of those under represented in the political process are subject to a “more searching judicial inquiry” than the inquiry that the majority applies. Carotene Prods. Co., 304 U.S. at 152 n. 4, 58 S.Ct. 778. If Congress wants to pass a uniform policy under its plenary immigration powers, it is certainly free to do so. But our “constitutional law appropriately exists,” as Dean Ely so ably stated, “for those situations where representative government cannot be trusted, not those where we know it can.” Ely, supra at 183. The Constitution protects minorities, which we all are, in one way or another.
Accordingly, I dissent.[5]

. This histoiy is certainly counter-intuitive for a nation populated not just at the outset, but through its history, by recurrent waves of immigration. For example "early twentieth-century restrictionists viewed Italians and Eastern Europeans (especially Jews) as outside their 'race.' ” Hiroshi Motomura, Whose Alien Nation?: Two Models of Constitutional Immigration Law, 94 Mich. L.Rev.1927, 1931 (1996). This is particularly morally ironic, noting that Jewish law is one of the major foundations for modern equal protection doctrine. See Richard Elliott Friedman, Commentary on the Torah 385 (2001) ("And if an alien will reside with you in your land, you shall not persecute him. The alien who resides with you shall be to you like a citizen of yours, and you shall love him as yourself, because you were aliens in the land of Egypt. I am the YWWH, your God.” (trans. oí Leviticus 19:33-34)) (emphasis supplied). “Earlier and in like manner, many who sought to preserve American 'racial purity’ in the mid-nineteenth century did not consider the Irish to belong to the same race as Anglo Saxon Protestant immigrants.” Motomura, supra, at 1931.

. Although strict scrutiny review is the general rule when states create classifications based on alienage, the Supreme Court has created two discrete and specific exceptions. The Court recognizes a self-government exception that applies when a state creates a law excluding aliens from participation in its democratic political institutions. Only rational basis review is used under this exception. Thus, a “State, in the course of defining its political community, may, in appropriate circumstances, limit the participation of nonciti-zens in the States' political and governmental functions." Toll, 458 U.S. at 12 n. 17, 102 S.Ct. 2977 (citing Cabell v. Chavez-Salido, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982); Ambach v. Norwick, 441 U.S. 68, 72-75, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); Foley v. Connelie, 435 U.S. 291, 295-96, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); Sugarman v. Dougall, 413 U.S. 634, 646-49, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)).
Second, the Supreme Court has recognized an exception to the application of strict scrutiny in one case concerning undocumented or illegal aliens. In Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the Supreme Court applied an intermediate level of scrutiny and declared unconstitutional a Texas law that provided free public education for children of citizens and lawfully admitted aliens, but required undocumented aliens to pay for schooling for their children. The Court held that strict scrutiny was inapplicable because illegal aliens cannot be treated as a suspect class. Id. at 223, 102 S.Ct. 2382. However, the Court applied more than rational basis review, emphasizing the innocence of the children involved and the importance that such children receive an education. Id. at 223-24, 102 S.Ct. 2382. Here, of course, we are dealing with legal aliens, who pay taxes and are eligible to serve in the military.

. Apart from the legal problems this statute faces, it is not completely clear that it would pass a rational basis test. As noted, the aliens affected by S.B. 03-176 include those who pay taxes — -just like all other law-abiding Coloradans — and those legal aliens who serve in the military. Furthermore, there is no indication that immigrants will require more public assistance that similarly situated natives. See Robert Kaestner, "Should Immigrants Be Singled Out? " 15 Pol'y F. 1 (2002). In fact, recent studies have indicated that “immigrants are more likely than similarly situated natives to achieve economic self-sufficiency,” irrespective of public benefits. Id. at 3. "[Ijmmigrants are not a group in need of unusually strong incentives to become economically self-sufficient.” Id. The denial of benefits will not necessarily reduce the composition or number of immigrants locating in any particular state. Id.
Colorado’s enactment of S.B. 03-176 was largely based on reallocating public resources in an effort to achieve a balanced budget, Aple’s Br. at 28, and this decision appears to have no compelling rationale, apart from “anti-immigrant sentiment.” Kaestner, supra, at 3. Noting that rational basis tests require more rationality than they used to, it is not clear to me on this record that the statute meets rationality. I do not reach this, however, because the proper test is strict scrutiny, and it is clear that “level of scrutiny is essentially dispositive of [this] litigation.” 257 F.Supp.2d at 1325.

. As indicative of the true workings of the Colorado statute, I also emphasize the language of the Notice of Medicaid Closure form that was to be sent to recipients that did not return the redetermination packet. See Maj. op. at 1260. The Notice states that
The household member(s) listed above lost their Medicaid because a new state law changed the citizenship requirements for the program.
Aplt's App. at 136 (emphasis supplied). Question (2) of the redetermination packet asked "Is this person a U.S. citizen?” Id. at 132. Clearly, the State recognizes that the entirety of the class is affected.

. Because I would reverse the district court's denial of a preliminary injunction to the plaintiffs, I do not separately address the procedural violations alleged by plaintiffs. To the extent that the majority reverses the district court's denial of a preliminary injunction for purposes of redetermination, I agree with this holding.