[852 NYS2d 40]

BORIS KHRAPUNSKIY et al., Respondents, v ROBERT DOAR, as Commissioner of the New York State Office of Temporary and Disability Assistance, Appellant.

First Department, January 17, 2008

## APPEARANCES OF COUNSEL

*Andrew M. Cuomo, Attorney General*, New York City (*Oren L. Zeve* and *Michelle Aronowitz* of counsel), for appellant.

*Yisroel Shulman, New York Legal Assistance Group*, New York City (*Constance P. Carden* and *Irina Matiychenko* of counsel); *Scott A. Rosenberg, The Legal Aid Society*, New York City (*Jennifer Baum* of counsel); *Barbara Weiner*, Albany; *Weil, Gotshal & Manges*, New York City (*Richard W. Slack* and *Idit Froim* of counsel), for respondents.

## OPINION OF THE COURT

ANDRIAS, J.P.

The question presented is whether New York State residents, who are lawfully admitted residents of the United States and also elderly, blind or disabled, are entitled to receive public assistance in the amounts defined in Social Services Law § 209 (2) as "the standard of monthly need" or minimum levels deemed necessary by the Legislature for their adequate support. We conclude that they are.

American citizens who are needy aged, blind or disabled are entitled to federal Supplemental Security Income (SSI), federally administered additional state payments (ASP), state public assistance (now called safety net assistance) and federal and state Medicaid. Illegal aliens are ineligible for any of those benefits. What we are dealing with here are plaintiffs who are, for the most part, aliens who are legally in this country, who were originally eligible for SSI and ASP, but became ineligible solely by reason of their failure to become American citizens within the alloted seven years. Essentially, the issue is whether or not legal aliens ineligible for SSI and ASP, who are just as aged, blind or disabled as similarly-situated citizens, are entitled pursuant to the State Constitution to the same level of benefits, in this case safety net assistance plus some form of supplement to bring their benefits up to the ASP level.

Generally, SSI plus ASP provides higher monthly payments than safety net assistance, there being a rational basis for finding that the aged, blind or disabled are needier than other needy persons who are not aged, blind or disabled. Congress in its wisdom has the power to decide that certain categories of needy aged, blind or disabled persons are ineligible for SSI and federally administered ASP simply by reason of their alien status. If Congress preempts the field by imposing a uniform policy setting minimum benefits and eligibility requirements nationwide, the states may enact laws mirroring the federal statutes and regulations without fear of running afoul of the Equal Protection Clause (*see Graham v Richardson*, 403 US 365, 382 [1971]; *Matter of Aliessa v Novello*, 96 NY2d 418, 434 [2001]). Where, however, Congress has given the states some leeway in determining whether to provide more than the federal standard of benefits, the states may not limit those additional or supplemental benefits by imposing on legal aliens an overly burdensome eligibility requirement having nothing to do with need (*see Matter of Aliessa v Novello*, 96 NY2d 418 [2001], *supra*).

The history of Social Services Law § 209 (2) is not in dispute. Prior to January 1974, New York furnished public assistance to all aged, disabled and blind persons who, because of their physical condition, were unable to support themselves under a program entitled "Aid to the Aged, Blind and Disabled" (AABD) (*see* Social Services Law former art 5, tit 6). In 1972, Congress established the SSI program, designed to aid the same class of persons previously covered in New York by AABD, that, effective January 1974, provided for a flat grant of federal funds and

an optional state supplement. As a result, the Legislature discontinued the AABD program, repealed the old law and adopted a new title 6 of article 5 of the Social Services Law, entitled "Additional State Payments for Eligible Aged, Blind and Disabled Persons" (ASP) (Social Services Law §§ 207-212), that provides for additional state payments to the aged, blind and disabled who either receive federal SSI payments (42 USC § 1381 *et seq.*), or whose income or resources, although too great to receive SSI payments, is below the "standard of monthly need" set out in Social Services Law § 209 (2). At the time it was adopted, eligibility for ASP was limited to needy aged, blind or disabled persons who were residents of New York and either United States citizens or aliens who had not been determined by an appropriate federal authority to be unlawfully residing in the United States. Thereafter, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) (tit IV, codified at 8 USC § 1601 *et seq.*), which, as relevant to this appeal, restricted alien eligibility for federally funded public assistance benefits and authorized the states to follow suit with their own programs. As a result, Social Services Law § 209 (1) (a) (iv) was amended in 1998 to limit eligibility for ASP to residents of the state who, if not citizens of the United States, would not be disqualified from receiving federal SSI benefits solely by reason of their alien status. The purpose of the amendment was to conform state law with federal law and to "make clear which aliens may be eligible for state supplementation of the federal supplemental security income program" (Senate Mem in Support of L 1998, ch 214, 1998 McKinney's Session Laws of NY, at 1667).

While some statutes are so clear as to foreclose courts from construing or interpreting them, in an appropriate case the courts may depart from a too literal reading of the statute when such a reading destroys the meaning, intention, purpose or beneficial end for which the statute was designed (*see generally* McKinney's Cons Laws of NY, Book 1, Statutes § 111). This, we suggest, is such a case.

When Congress established the SSI program in order to provide a uniform standard of need and payment nationwide, it took over the duties of determining eligibility and the amount of payments from the states, but required the continuation of state benefits under an equivalent pre-SSI program (in New York, the AABD program) where those benefits were higher than what SSI would provide. It also permitted states to adopt

optional state supplements through which the state could provide amounts above the SSI payments. As a result, the New York State Legislature repealed the AABD program and established the ASP program as a supplement to SSI, finding "unfortunately, that [the SSI] standard is far lower than the standard of need for the[ ] same persons under the state's former AABD program" (Mem in Support of L 1974, ch 180, 1974 NY Legis Ann, at 147).

Indeed, in approving the establishment of the ASP program, Governor Wilson characterized the federal SSI program as having "completely failed to meet the special needs of this group" (Governor's Approval Message, 1974 NY Legis Ann, at 434). He went on to say that this most deserving group of New Yorkers had suffered most from "the cruel hoax perpetrated by the SSI program in, among other things, penalizing SSI recipients and taxpayers in those states, like New York, which have long dealt more compassionately with the needs of the aging than many of our sister states" (id.). As a result, the Legislature provided for "full and permanent authority for a state program to supplement the federal [SSI] program" (1974 NY Legis Ann, at 147). It also deemed it "important that there be authority for the continuation of a program of additional State payments in the event of a termination of federal administration" (id.). The Legislature's declared purpose in establishing a statewide program of additional state payments was to meet "the income needs of aged, blind and disabled persons who are receiving basic supplemental security income benefits or whose income and resources, though above the standard of need for the supplemental security income program, is not sufficient to meet those needs" (L 1974, ch 1080, § 1, adding Social Services Law § 207 [unchanged]).

Thus, there can be no doubt that the Legislature intended to establish a more generous level of support for aged, blind and disabled New Yorkers and anticipated the possibility that the federal government might terminate its administration of the ASP program, although there is no indication that it anticipated that 22 years later Congress, in enacting PRWORA, would, in effect, terminate its administration of the ASP program for a certain class of aliens by declaring them ineligible for such program solely on the basis of their alienage.

While ASP clearly was intended as a state funded supplement to the federally funded SSI payments so that aged, blind and disabled persons would continue to receive benefits consistent

with the standard of need established in Social Services Law § 209 (2), the fact is that for 22 years all needy aged, blind and disabled persons in the state, other than illegal aliens, were eligible for both SSI and ASP. Clearly, the Legislature's intention was to guarantee all legally resident aged, blind and disabled persons, citizen and noncitizen alike, assistance at the more generous level set forth in section 209 (2), whether such assistance was split between SSI paid by the federal government and ASP paid for with state funds, but administered by the federal government or, in the case of those otherwise eligible persons who were financially ineligible for SSI, such assistance was paid solely with state funds, but also federally administered. When Congress stopped the SSI and ASP for this class of legal aliens, however, the Legislature, rather than continuing to provide the same section 209 (2) level of support, simply relegated these same needy aged, blind and disabled persons to receiving benefits at the lower standard of need set by Social Services Law § 131-a (2).

In this case, plaintiffs are not seeking SSI or ASP; they are seeking to increase their monthly grants for safety net assistance pursuant to Social Services Law § 131-a (2) (currently $112 for one person living alone plus amounts for shelter and food) to the standard of monthly need set by Social Services Law § 209 (2) (currently $690 for an eligible individual living alone depending on geographic area).

The crux of plaintiffs' argument is that the standard of need in Social Services Law § 209 (2) sets forth the minimum income standard determined necessary by the Legislature to meet the needs of New York's elderly, blind and disabled residents. They argue that, in establishing the ASP program in 1974, the Legislature defined the income levels set forth in section 209 (2) as a "standard of monthly need," not simply a state SSI supplemental or payment standard. The term "standard of need," plaintiffs argue, has special significance under article XVII of the New York Constitution since it defines the minimum income level deemed necessary by the Legislature for the adequate support of those to whom it applies. Moreover, plaintiffs argue, such standard cannot be limited exclusively to persons who are eligible for SSI inasmuch as the standard of need must relate to actual "need" and may not be tied to factors unrelated to need, such as eligibility for federal SSI benefits.

Defendant, on the other hand, in urging a plain reading and strict construction of the statute, argues that section 209 (2)

does not set forth a general "standard of monthly need" for the needy aged, blind and disabled, and that such standard is limited to persons receiving or otherwise eligible for SSI and ASP, unlike plaintiffs, who are no longer eligible due to their alien status.

The motion court (Jane S. Solomon, J.) agreed with plaintiffs that the State may not stop paying benefits at the level it established in 1974 in Social Services Law § 209 (2) merely because the federal government, in 1996, chose to deny SSI benefits to a particular subgroup of those the State had previously and continues to classify as the needy aged, blind and disabled. Based upon the foregoing legislative history as well as Court of Appeals precedent, we conclude Justice Solomon was correct.

In *Matter of Lee v Smith* (43 NY2d 453 [1977]), the Court of Appeals held that then Social Services Law § 158 (a), which provided that "a person who has applied for and been determined to be eligible for federal supplementary security income payments and/or additional state payments shall not be eligible for home relief [now 'safety net' payments]," was unconstitutional as violative of the equal protection guarantees of the State and Federal Constitutions as well as article XVII of the State Constitution, requiring the State to provide for the aid, care and support of the needy. Then, as now, there were two distinct standards of monthly need: one for the aged, disabled and blind (Social Services Law § 209 [2]) and the other for all other classes of needy persons (Social Services Law § 131-a [2]).

The State did not argue that section 158 (a), insofar as it established the needs of many aged, disabled and blind persons at a level less than those in all other classes, was based on any rational distinction between their actual or general fiscal needs and the needs of those in the other categories. Instead, it argued that there was a rational basis for such disparate treatment because accepting the federal government's administration of SSI grants and its establishment of the standard of need for those recipients in a manner different from that used in state administered programs would reduce the State's administrative costs.

While recognizing that such reduction is a legitimate state interest, the Court of Appeals noted that petitioners were not requesting increased SSI payments, but direct state aid in the form of home relief. The Court found that there was nothing to indicate that the granting of that relief would jeopardize the

State's interest in insuring that its contributions to the SSI program satisfy federal requirements. Thus, it held Social Services Law § 158 (a), insofar as it denied home relief to all SSI recipients, bore no rational relationship to that objective (*Matter of Lee v Smith*, 43 NY2d at 461-462 [Wachtler, Ch. J.]). Likewise, in this case plaintiffs do not seek SSI or ASP, but only an increase in their safety net payments to ASP levels.

In *Matter of Aliessa v Novello* (274 AD2d 347 [2000]), this Court unanimously declared that Social Services Law § 122, which provided that aliens other than "qualified aliens" were eligible only for Medicaid coverage for emergency medical treatment, did not violate article XVII, § 1 of the New York Constitution insofar as it denied medical assistance to legal residents solely on the basis of their immigration status. In so ruling, we held that the IAS court had incorrectly distinguished *Aliessa* from our decision in *Alvarino v Wing* (261 AD2d 255 [1999]), which unanimously upheld Social Services Law § 95 (10), which restricted eligibility for food stamps to certain categories of aliens.

In *Alvarino* and *Aliessa*, the challenged classifications were, as here, enacted in direct response to federal supplemental legislation authorizing the states to provide food assistance or Medicaid to aliens no longer eligible for federally funded food stamps (*Alvarino*) or Medicaid (*Aliessa*) by reason of Congress's enactment of PRWORA. In *Alvarino*, this Court held that the challenged provisions were therefore entitled to the same rational basis review as would a federally enacted law classifying aliens, and no argument was made challenging the rationality of any of the five requirements an alien must satisfy in order to qualify for food assistance (under age 18 or elderly or disabled, etc.) (*id.* at 256).

In unanimously reversing this Court, the Court of Appeals in *Aliessa* held that Social Services Law § 122 violated article XVII, § 1 of the New York Constitution (*Matter of Aliessa v Novello*, 96 NY2d at 429 [Rosenblatt, J.]). In light of its finding that section 122 denied plaintiffs equal protection under the United States and New York Constitutions, the Court did not reach the issue raised by the State at the time that section 122 was enacted in response to Congress's enactment of PRWORA (*id.* at 429 n 12). In also finding that section 122 denied plaintiffs equal protection, the Court noted that the State did not attempt to justify section 122 under a strict scrutiny standard, but argued that strict scrutiny did not apply because section 122

implements PRWORA title IV's federal immigration policy and should therefore be evaluated under the less stringent "rational basis" standard (*id.* at 432).

Comparing state and congressional legislative authority in the context of immigration and naturalization and relying upon *Graham v Richardson* (403 US 365 [1971], *supra*), the Court held that title IV does not impose a *uniform* immigration rule for states to follow but, in administering their own programs, the states were "free to discriminate in either direction—producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics" (*Matter of Aliessa v Novello*, 96 NY2d at 435). Considering that Congress conferred upon the states such broad discretionary power to grant or deny aliens state Medicaid, the Court was unable to conclude that title IV reflects a uniform national policy. "If the rule were uniform, each State would carry out the same policy under the mandate of Congress—the only body with authority to set immigration policy" (*id.*). The Court found that when New York exercised its discretion under title IV, in choosing to continue Medicaid coverage for some but not all formerly ineligible Medicaid recipients, with congressional permission, it was choosing its own policy with respect to health benefits for resident, indigent legal aliens. Thus, the Court addressed the case outside the context of a congressional command for nationwide uniformity in the scope of Medicaid coverage for indigent aliens as a matter of federal immigration policy and held that Social Services Law § 122 violated the Equal Protection Clauses of the New York and United States Constitutions insofar as it denied state Medicaid to otherwise eligible lawfully admitted permanent residents based on their status as aliens.

As further held by the Court, in words equally applicable to this appeal,

> "the concept of need plays no part in the operation of section 122. Indeed, the statute suffers from an infirmity comparable to the one in *Tucker* [*v Toia*, 43 NY2d 1, 7 (1977) (care for the needy is not a matter of "legislative grace"; it is a constitutional mandate)] and cannot be justified on the basis of a distinction between qualified aliens and PRUCOLs [permanent residents under color of law] on the one hand, and citizens on the other. We conclude that section 122 violates the letter and spirit of article

XVII, § 1 by imposing on plaintiffs an overly burdensome eligibility condition having nothing to do with need, depriving them of an entire category of otherwise available basic necessity benefits" (*Matter of Aliessa*, 96 NY2d at 429).

Defendant argues that unlike *Matter of Aliessa v Novello*, plaintiffs here have not been denied SSI and ASP by the State. Instead, they seek to increase the public assistance they receive to the standard of need level set by Social Services Law § 209 (2). Thus, defendant contends, and the dissent agrees, that *Matter of Aliessa* does not apply here where the section 209 eligibility determination and payment is governed by federal law and only applies where, unlike here, the State has created a program independent of federal eligibility or payment requirements. The Legislature, it is argued, has no discretion to expand the group of individuals eligible for ASP beyond the federally authorized individuals, the only method being to create an entirely different program requiring legislative authorization and funding, which the Legislature has not opted to do. However, the question is not whether the Legislature has to create an entirely new program to provide ASP to plaintiffs, which would not be so difficult and in any event would not be dispositive, but whether, in amending the Social Services Law to exclude previously eligible individuals from the ASP program, the Legislature did so for impermissible reasons. Thus, in the event the failure to provide assistance at the section 209 (2) level is a violation of article XVII, § 1 of the New York Constitution and the State is mandated to provide such benefits, it is no defense to argue that it should be relieved of such constitutional mandate because, by failing to provide it in the past, it is unprepared to provide it now.

We also affirm the class certification of Supreme Court with the proviso that, as is apparently conceded by plaintiffs, the ultimate determination of an individual's eligibility for the aid at issue will rest with defendant, provided, of course, that such determination is not based on improper factors or considerations.

We have considered defendant's remaining arguments and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Jane S. Solomon, J.), entered August 17, 2005, which, inter alia, granted plaintiffs' motion for summary judgment, enjoining defendant from "failing to provide assistance to

plaintiffs and the class consistent with the standard of need set out in Social Services Law § 209 (2)" (9 Misc 3d 1109[A], 2005 NY Slip Op 51462[U], *8); directed that defendant provide plaintiffs and the plaintiff class all retroactive benefits denied under the rubric of SSI and directed that assistance thereafter be provided at no less than the standard of need set out in Social Services Law § 209 (2), so long as eligibility for such assistance is maintained; and certified the class of plaintiffs as "[a]ll persons identified to, or identifiable by, defendant as elderly, blind, and disabled persons lawfully residing in New York State who have received, are receiving, or will receive assistance at less than the standard of need set out in [Social Services Law § ] 209 (2), solely because of their immigration status" (id.), should be affirmed, without costs.

CATTERSON, J. (dissenting). Because I believe that neither the court below nor the majority may usurp the function of the Legislature to convert an appropriation for a supplement to a federal benefit into a fully-fledged, new state-funded program, I must respectfully dissent.

Until 1996, the plaintiffs in this class of elderly, blind and disabled persons who are lawful residents of New York State but are not American citizens were eligible for federal Supplemental Security Income (hereinafter referred to as SSI) benefits, and consequently were also eligible for an additional state payment (ASP) pursuant to Social Services Law §§ 207-212. However, with the passage of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (hereinafter referred to as the Welfare Reform Act) (tit IV, codified at 8 USC § 1601 et seq.), Congress denied federal benefits like SSI and food stamps to certain categories of qualified aliens, distinguishing between them and U.S. citizens. The Welfare Reform Act further provided that states that had made provisions for additional payments like New York's ASP, and which had also entered into agreements whereby the federal government administered the supplemental program, were bound by the restrictions. (See 8 USC § 1612 [a] [1], [3] [A]; 20 CFR 416.2040.) As a result, the plaintiffs in this class action who for various reasons[1] became ineligible for SSI, lost their ASP.

---

1. The plaintiffs, all legal immigrants, fall into one of two categories. One group of class members entered the United States in a humanitarian-based status (for example, a refugee) after August 22, 1996. Because of their immigration status, they are eligible for SSI only during the first seven years of that humanitarian-based status. Thereafter, unless they have become United

It is uncontested that the plaintiffs then became eligible for, and currently receive, public assistance pursuant to Social Services Law § 131-a. However, the monthly payments are less than the payment they received as a combined SSI and ASP federal benefit.[2]

The plaintiffs commenced this action seeking an increase in their *state* public assistance to the level they claim was established as a separate "standard of monthly need" for the aged, blind and disabled by the Legislature in Social Services Law § 209 (2) when it set the amounts for the ASP. The plaintiffs did not dispute that the ASP was denied them because it was inextricably linked to eligibility for the federal SSI benefits. Nor did the plaintiffs seek reinstatement of their SSI or ASP payments under the federal program. Instead, the plaintiffs sought to be provided with public assistance benefits by the administrative mechanisms of Social Services Law § 131-a but calculated at the higher amount established by Social Services Law § 209 (2).

In effect, the plaintiffs "hung their hat" on the assertion that the Legislature had established a higher standard of need for the aged, disabled and blind *as a general class* in Social Services Law § 209 (2). On a motion for summary judgment, they argued that the State's failure to increase their benefits is a violation of article XVII, § 1 of the New York Constitution, which imposes an affirmative duty on the State to aid the needy. The plaintiffs also argued that by denying such increased benefit to persons based solely on immigration status, the State is violating their equal protection rights under both the Federal and State Constitutions.

The motion court agreed with the plaintiffs, holding that the standard of need set out in Social Services Law § 209 (2) was

States citizens, those class members are ineligible for SSI and, pursuant to Social Services Law § 122 (1) (f), § 208 (2) and § 209 (1) (a) (iv), they are also ineligible for additional state payments. The second group consists of class members who never received SSI because federal law has, since 1996, excluded them from the SSI program, either because they are permanently residing under color of law and were not receiving SSI on August 22, 1996, or are qualified immigrants, other than humanitarian-based immigrants, who entered the U.S. after August 22, 1996 but who cannot be credited with 40 qualifying quarters of earnings, or are not members of the armed services or honorably discharged veterans and their immediate family. (*See* 8 USC § 1612.)

2. According to the plaintiffs, the combined amount for an elderly, blind or disabled single New Yorker is $690, of which the SSI component is $603 per month; whereas the standard of monthly need established for a single adult not elderly or disabled is $352.

the State's "independent determination of the level of assistance appropriate for such [aged, blind and disabled] persons in New York" (9 Misc 3d 1109[A], 2005 NY Slip Op 51462[U], *5) and thus the State was obliged to meet that level according to article XVII, § 1 of the New York Constitution. The court also held that the State's disparate treatment of plaintiffs based solely on immigration status violated their equal protection rights. Further, the motion court ordered retroactive payments to be made to the plaintiffs to bring them up to the level of assistance they would have received pursuant to Social Services Law § 209 (2) before they became ineligible on immigration status grounds, and to continue their payments on that basis.

On appeal, defendant, the Commissioner of the New York State Office of Temporary and Disability Assistance (hereinafter referred to as OTDA), sought to reverse this separation-of-powers violation wherein the lower court has impermissibly rewritten statutory provisions resulting in a grant of appropriations by judicial decision rather than legislative enactment. For the reasons set forth below, I believe that the motion court and the majority ignored history, plain language, legislative intent and the principles of statutory construction.

As a threshold matter, OTDA does not argue with the fact that historically, the State has expressed, as a "special matter of state concern and a necessity in promoting the public health and welfare," the need to provide for the care and relief of the aged and disabled. (*See e.g.* L 1930, ch 387, § 1, adding Public Welfare Law § 122; L 1951, ch 77, § 1, adding Social Services Law § 300.) However, the Aid to the Aged, Blind and Disabled programs (hereinafter referred to as AABD) providing relief to these groups have changed over time.

Most significantly, in 1972, the federal government assumed responsibility for this group, enacting the SSI program to provide cash assistance to the aged, blind and disabled with little or no income. (*See* 42 USC § 1381 *et seq.*) This program, effective January 1974, provided cash for food, shelter, clothing, medical care and other items. From its inception, SSI excluded various persons for various reasons; for example, alcoholics or drug addicts who did not participate in treatment, and individuals outside the country. (42 USC § 1382 [e], [f]; 20 CFR 416.202.)

In December 1973, the federal government enacted the Mandatory Minimum State Supplementation of Supplemental Security Income Benefits amendment. This required the states to provide one of two types of supplements. The first type of

supplement was required where pre-SSI benefits were higher than what SSI was providing. (*See* 42 USC § 1382.) That is, states had to make up the difference so that the SSI benefits and the state benefits combined could be no less than the person was receiving under the former state program for the aged, blind and disabled. The other type of supplement permitted states to adopt optional state supplements through which the state could provide amounts above the SSI payments.

In 1974, because the federal government had assumed responsibility for the aged, blind and disabled, New York State altered its policies and obligations with respect to this group. It repealed its AABD programs and replaced them in their entirety with the federal SSI program by the enactment of "Title 6—Additional State Payments for Eligible Aged, Blind and Disabled Persons" (ASP). (L 1974, ch 1080, § 1, adding Social Services Law §§ 207-212.)

The states had two options for administration of the supplemental payments. They could enter into an agreement with the Social Security Administration, under which the federal government would administer the distributions based solely on federal standards of eligibility, or the state could administer the supplements itself. (42 USC § 1382e [a]-[b].) New York entered into an agreement for federal administration of its supplemental payments to the aged, blind and disabled. (*See* Social Services Law § 211.)

As a result, the federal government administers and determines eligibility for the state supplemental payments in tandem with SSI benefits. In fact, ASP eligibility is governed by federal law, which provides that the only aged, blind and disabled who are eligible for ASP are those who are eligible for SSI benefits "or who would but for their income be eligible to receive [SSI] benefits." (*See* 42 USC § 1382e [a].) Thus, the New York Legislature enacted provisions to parallel the federal provisions. (*See* Social Services Law §§ 207-212; *see also* Social Services Law § 122 [1] [f].)

The plaintiffs do not challenge the constitutionality of these provisions or seek reinstatement in the federal program. Instead they contend that by enacting these provisions, specifically Social Services Law § 209 (2) which sets the amounts of the supplemental payments, the Legislature set a higher and different standard of need for the aged, blind and disabled. They contend, therefore, that the State's failure to meet that level violates New York Constitution, article XVII, § 1 which states

that, "The aid, care and support of the needy are public concerns and shall be provided by the state . . . ."

The most pertinent question then is, whether Social Services Law § 209, in fact, establishes a *state-recognized* higher "standard of need" for the aged, blind and disabled of the state. OTDA contends that it does not.

OTDA asserts that sections 207-212 were enacted only as SSI *supplements*, and were not intended to set a "standard of need" as a general matter of public assistance. OTDA further points to the fact that the Legislature repealed its prior assistance to the aged, blind and disabled, and that sections 207-212 are not listed under the definition of "public assistance" in Social Services Law § 2 (19). (*See also Matter of Garvey v Kirby*, 94 AD2d 702, 703 [2d Dept 1983] [a person receiving SSI benefits is not within the statutory definition of one receiving public assistance].)

Indeed, it is uncontested that when the Legislature enacted the ASP (Social Services Law, art 5, tit 6, §§ 207-212, as added by L 1974, ch 1080, § 1), it repealed the prior AABD programs and transferred those recipients from the AABD programs to the SSI program. (L 1974, ch 1080, §§ 3-4.) It further amended "Public assistance and care" by striking out reference to "old age assistance, assistance to the blind, [and] aid to the disabled." (*Id*. § 5, amending Social Services Law § 2 [20].)

OTDA also asserts that sections 207-212 repeatedly refer to *supplemental* payments to the federal benefits for eligible recipients and do not by any reference or cross-reference award such payments to any aged, blind or disabled who are not eligible for the federal program. OTDA thus maintains that there is no indication of any legislative intention to create a separate article XVII, § 1 public assistance program for the aged, blind and disabled who are not eligible for the federal program.

I find OTDA's arguments persuasive. First, a plain reading of title 6 clearly evinces the Legislature's intention to limit the additional state payments to a certain subgroup of the State's aged, blind and disabled. The title 6 heading is: "*Additional* State Payments for *Eligible* Aged, Blind and Disabled Persons" (emphasis added].)

Second, Social Services Law § 207 in its "Declaration of purpose" of ASP clearly describes the eligible subgroup as those who are eligible for, and receiving SSI benefits or who would be receiving them but for their income:

"The legislature hereby declares its commitment to meeting the income needs of *aged, blind and disabled persons who are receiving basic supplemental security income benefits or whose income and resources, though above the standard of need for the supplemental security income program*, is not sufficient to meet those needs. In order to maintain assistance for such persons at a level consistent with their needs, and *in order to fully employ available federal aid for the benefit of such persons residing in this state*, there is hereby established a state-wide program of additional state payments for aged, blind and disabled persons" (emphasis added).

The description of those eligible for ASP tracks the language of the federal statute. (*See* 42 USC § 1382.) It also makes quite clear that the ASP is mandated by federal law and not by any independent state grant of aid. (*See* Social Services Law § 207 ["in order to fully employ available federal aid . . . there is hereby established a state-wide program of additional state payments"].)

Further, Social Services Law § 209 repeatedly refers to "additional state payments" and "eligible" persons, evincing an intent that such figures should be used only to determine the State's *additional* payments under ASP, and only for those recipients eligible to receive federal benefits of SSI.

I can find nothing either in the plain language of the statute or legislative history to suggest that the Legislature was enacting a general standard of need that applied *or would apply* if the federal government denied SSI to an aged, blind or disabled person. Indeed, the majority does not point to *any* provision in the state law authorizing a state payment to every aged, blind, or disabled person regardless of their eligibility for SSI. Further, when faced with the potential exclusion of some aged, blind and disabled recipients by the Welfare Reform Act, the 1997 Legislature did not alter the language of the statutes establishing ASP to provide a specific benefit under a section 209 (2) standard of need, and made no cross-reference of that standard of need into the provisions of public assistance pursuant to Social Services Law §§ 131 and 131-a.

Consequently, I conclude that the motion court erred in finding that the State's failure to pay increased benefits to this group was a violation of article XVII, § 1 of the New York Constitution which states: "The aid, care and support of the needy

are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."

In effect, this article provides the Legislature with discretion in determining the means by which this objective is to be achieved, in determining the amount of aid and in classifying recipients and defining the term "needy." (*See Matter of Aliessa v Novello*, 96 NY2d 418, 428 [2001] ["New York is not required to meet every legitimate need of every needy person . . . (T)he Legislature may determine who is 'needy' and allocate the public dollar accordingly"].)

In the instant case, it is clear that the Legislature does not recognize the aged, blind and disabled as a separate group of recipients or separate or special class of "needy," much less as a class or group with a different state-recognized "standard of need." (Social Services Law § 207.) Their classification as a group for purposes of ongoing financial aid appears *only* in the context of a federally funded and federally administered welfare program.

Any assertion that the State could have just *continued* to provide the same section 209 (2) level of support to the plaintiffs rather than relegating them to receiving benefits at the lower standard of public assistance substitutes sentimentality for legal analysis. As even the plaintiffs themselves concede, the provision of such benefits could not be continued under Social Services Law § 209 which is inextricably linked to federal SSI eligibility. Yet, to simply agree with the lower court that such increased benefits must now be paid by utilizing the administrative mechanisms of the public assistance program pursuant to an entirely different and separate statutory provision is to ignore the reality that such mixing and matching by judicial fiat essentially and impermissibly usurps the role of the Legislature.

I conclude that the motion court also erred in finding a violation of the plaintiffs' equal protection rights under both the Federal and State Constitutions. OTDA asserts that the denial of the additional state payment to this class of aliens is mandated by federal law, and so, while the State may not distinguish based on immigration status, the federal government is authorized to do so, and the State must comply with this federal law.

The plaintiffs, on the other hand, rely on *Matter of Aliessa v Novello* (96 NY2d 418 [2001]) to assert that they seek state assistance, and that, where states retain discretion in allocating

welfare benefits they may not discriminate against lawful aliens in exercising that discretion. In *Aliessa*, the State, pursuant to Social Services Law § 122, denied state Medicaid benefits to legal aliens permanently residing in the United States under color of law (PRUCOLs). Those aliens asserted that section 122 violated article XVII, § 1 of the New York Constitution, as well as the Equal Protection Clauses of the State and Federal Constitutions. The Court of Appeals agreed. With regard to the equal protection claim, the Court noted that, when allocating welfare benefits, the Constitution does not prohibit Congress from distinguishing between aliens and citizens. (*Id.* at 433, citing *Mathews v Diaz*, 426 US 67, 69, 77-81 [1976].) However, as the Court noted, "State 'regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.' " (*Aliessa* at 433, quoting *De Canas v Bica*, 424 US 351, 358 n 6 [1976].)

Thus, while Congress may authorize a uniform immigration rule for states to follow, nevertheless, where states retain discretion, they may not discriminate against lawful aliens in exercising that discretion. Given that such discretion existed with Social Services Law § 122 in *Aliessa*, the Court found that section 122 was subject to strict scrutiny and could not pass that test.

The plaintiffs' reliance on *Aliessa* is totally misplaced, however. In that case, the Court reviewed only the state-funded portion of the Medicaid program. (*Id.* at 421-422.)[3] Thus, discretion existed because it was a solely state-funded and state-administered Medicaid program where the State, *at its own option*, had included residents who were ineligible for the federally subsidized program. Moreover, that state program was already in place when the *Aliessa* plaintiffs were denied benefits, unlike in the instant case where there is no state-funded or state-administered assistance program in existence specifically for the aged, blind and disabled.

It is uncontested that the only state-funded and administered public assistance program that is in place for all classes of "needy" residents has not denied benefits to the plaintiffs but

**3.** New York State's Medicaid system has two components: one that is federally funded, and to remain eligible for federal funds, New York must conform its Medicaid program to federal standards, and a Medicaid program which the State funds entirely on its own and makes available to residents not eligible for federally subsidized Medicaid.

includes them as recipients regardless of their immigration status. Further, New York does not pay the Social Services Law § 209 standard of need in the form of state public assistance to any person or group. There is, therefore, simply no state law classification that warrants finding an equal protection violation.

Finally, the plaintiffs asserted that because there is no prohibition against providing increased benefits to the plaintiffs by some other means, such as through the state public assistance programs (*see* 42 USC § 1382e [a]), the failure to set in motion the mechanisms to do so is an equal protection violation. In my opinion, this is error. While it is true that federal law authorizes states to enact laws extending "any State or local public benefit" even to those aliens "not lawfully present in the United States" (8 USC § 1621 [d]), the State has no obligation under equal protection principles to create a new program or expand an existing program simply because the federal government chooses not to extend its benefits or bars certain recipients.

So far, the State has not enacted a program to replace dollar for dollar the federally barred SSI/ASP benefit. Thus, there is no budget or administrative infrastructure in place to pay the additional benefits ordered by the motion court and affirmed by the majority, and only the Legislature has the authority to create the necessary agencies or agency links and programs demanded by the plaintiffs.

MARLOW and GONZALEZ, JJ., concur with ANDRIAS, J.P.; SWEENY and CATTERSON, JJ., dissent in a separate opinion by CATTERSON, J.

Order, Supreme Court, New York County, entered August 17, 2005, affirmed, without costs.